143 P.3d 1205

Benjamin N. PULAWA, III; Danelle L. Pulawa, individually and as Prochein Ami of Darcie L. Pulawa, and Benjamin N. Pulawa, IV, minor children,

v.

GTE HAWAIIAN TEL; E.E. Black, Defendants and Third–Party Plaintiffs–Appellees,

and

Universal Electric, Ltd., fka Occ–Electrical, Ltd., Third–Party Defendants–Appellees,

and

John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Partnerships 1–10, Doe Governmental Entities 1–10, and Doe Non–Profit Entities 1–10, Defendants.

No. 26715.

Supreme Court of Hawai'i.

Sept. 14, 2006.

4

Kenneth T. Okamoto and John D. Zalewski, Honolulu (of Price Okamoto Himeno & Lum), and Dan S. Ikehara (of the Law Offices of Dan S. Ikehara), on the briefs, for plaintiffs-appellants.

Jeffrey H.K. Sia, Diane W. Wong, J. Thomas Weber, and Ronald M. Shigekane (of Ayabe Chong, Nishimoto, Sia & Nakamura), on the briefs, Honolulu, for defendants and third-party plaintiffs-appellee GTE Hawaiian Tel and E.E. Black.

Keith K. Hiraoka and April Luria (of Roeca, Louie & Hiraoka), on the record, Honolulu, for third-party defendant-appellee Universal Electric, Ltd.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., ACOBA, J., Concurring and Dissenting, Separately.

Opinion of the Court by MOON, C.J.

Plaintiffs-appellants Benjamin Pulawa, III (Pulawa) and Danelle Pulawa, individually and as Prochein Ami for Darcie Pulawa and Benjamin Pulawa, IV [hereinafter, collectively, the plaintiffs or the Pulawas],[1] initiated the instant action for negligence arising out of an incident in which Pulawa, a construction superintendent, was seriously injured as a result of being struck in the head by a hardened bag of cement that was propelled into the air during the course of excavation work. The plaintiffs alleged that defendants-appellees E.E. Black, an excavation and duct line contractor, and GTE Hawaiian Tel (GTE), which had contracted with E.E. Black to conduct excavation and duct line work, were responsible for burying the cement bag approximately two to three years prior to the subject incident during the course of installing a telephone duct line in the same approximate area where Pulawa was overseeing excavation work in connection with a subsequent project.

The plaintiffs appeal from that portion of the Circuit Court of the First Circuit's May 25, 2004 final judgment [2] entered pursuant to an order granting summary judgment in favor of E.E. Black and GTE. Essentially, the circuit court ruled that E.E. Black did not owe a legal duty of care to Pulawa. The plaintiffs also challenge that portion of the circuit court's order denying in part their motion to disallow costs.

For the reasons discussed below, we affirm the circuit court's May 25, 2004 final judgment.

## I. BACKGROUND

### A. Factual Background

The relevant facts of the instant case involve two separate construction projects in

1. On August 19, 1998, Danelle Pulawa moved for an order appointing her as Prochein Ami for Darcie Pulawa and Benjamin Pulawa, IV, the Pulawas' two minor children. On the same day, the Honorable Virginia Lea Crandall granted the order.

2. The Honorable Dexter Del Rosario presided over the underlying proceedings unless otherwise indicated.

the Kakaʻako Improvement District in Honolulu, Hawaiʻi. The first project was conducted in 1993–1994 by E.E. Black. The second project was conducted in 1995–1996 by Oʻahu Construction Company (OCC), during which Pulawa sustained his injuries.

### 1. The 1993–1994 Project (Conducted by E.E. Black)

Sometime in 1993, GTE hired E.E. Black to install underground telephone lines along Kamakeʻe Street in the Kakaʻako Improvement District [hereinafter, the underground duct line project]. E.E. Black was responsible for furnishing all of the materials and labor, as well as for performing all of the necessary work for the project. Although a GTE engineer served as an inspector for the project, GTE hired Engineers Surveyors Hawaiʻi (ESH) to also provide inspection work for the project.

The underground duct line project involved certain excavation and backfill work. According to GTE's "Standard Specifications for Placing Underground Telephone Lines," which "are intended to govern the work on all contracts awarded for placement of underground telephone systems by GTE ... throughout the State of Hawaiʻi," "[a]ll wood and debris shall be removed from [the excavated] trench before backfilling[,]" and "[b]ackfill material shall be free of wood, paper or other objectionable material." The GTE inspector testified that the purpose of the foregoing requirements was to prevent "settlement and/or street failure." An E.E. Black foreman agreed that inappropriate backfill could lead to settlement and/or street failure. The ESH inspector also testified that improper backfill could potentially pose a danger to "equipment used by a future contractor" as well as to the safety of future contractors.

E.E. Black began excavation at the intersection of Kamakeʻe and Kona Streets on or about October 21, 1993. E.E. Black then backfilled the excavated area, using "select borrow" backfill material, on December 22, 1993. "Select borrow" is a type of backfill material, where the largest pieces of material used as backfill are no more than one inch in diameter.

During the underground duct line project, E.E. Black used "hand mixed" cement in order to make small repairs or patch existing sewer lines in the areas of construction. An ESH inspector witnessed E.E. Black mixing cement at the job site approximately ten times during the course of the project. E.E. Black's use of cement during the underground duct line project was acknowledged by an E.E. Black project engineer.

According to a "contract set of plans" that E.E. Black apparently utilized during its project, the fact that "there would be future underground work along Kamakeʻe Street" "[a]fter E.E. Black performed its work" was reflected on those plans. E.E. Black's project appeared to have concluded sometime in early 1994.

### 2. The 1995–1996 Project (Conducted by OCC)

Sometime in 1995, OCC began work on the installation of water and electrical lines, as well as widening roads and constructing new sidewalks and pavement in the Kakaʻako Improvement District. As part of the project, OCC was required to perform excavation work. On August 20, 1996, during the course of the excavation work, it appears that OCC encountered the GTE duct line that E.E. Black had previously installed. On that day, Pulawa, a construction superintendent employed by OCC, was overseeing the excavation work being performed by three other OCC employees at the intersection of Kamakeʻe and Kona Streets. One employee was operating a loader,[3] the second was operating a backhoe,[4] and the third employee was

---

3. According to one court, "[a] loader is a hydraulically operated accessory that attaches to the front of the tractor and can be used to lift and move gravel, sand, dirt, and the like." *Fabrication & Truck Equip., Inc. v. Powell*, 195 Or.App. 72, 96 P.3d 1251, 1253 n. 3 (2004).

4. According to one court, "[a] backhoe is a tractor-like machine used primarily for digging trenches." *Brimbau v. Ausdale Equip. Rental Corp.*, 119 R.I. 14, 376 A.2d 1058, 1060 n. 1 (1977). It is unclear from the record whether the employee was operating a backhoe or a hoptoe, which, according to E.E. Black and GTE, is smaller than a backhoe. Nevertheless, it is im-

acting as a grade checker. The backhoe operator was excavating a trench and placing the excavated material somewhere near the trench. The loader operator would then pick up the material and deposit it in a dump truck. Because of the limited space in the excavation area, the loader operator would have to drive over the pile of excavated material in order to place the scooped-up material into the dump truck. The loader operator would then reverse back over the pile and repeat the process until the excavated material was removed.

While removing the excavated material as described above, the loader operator indicated that he heard a "whoosh" sound as he was reversing over the pile of excavated material and saw what appeared to be a "rock" being propelled from the left rear tire of the loader, striking Pulawa on the head. When the accident occurred, Pulawa was apparently standing approximately fifteen to twenty feet away from the loader. According to the loader operator, he later believed that the "rock" was "a half bag of concrete." Another OCC employee described the "rock" as having "pieces of cement bag embedded in it." During the discovery process, it was apparently revealed that the "rock" was "a 30–pound chunk of hardened cement" "in a cement bag with brown packaging and plastic wrapping." As a result of the accident, Pulawa sustained severe head injuries, including a depressed and open skull fracture.

B. *Procedural History*

On August 19, 1998, the plaintiffs filed a complaint against GTE, E.E. Black, and Morrison Knudsen Corporation/Walter & SCI Construction (USA) (Morrison Knudsen).[5] On April 12, 2000, the plaintiffs filed a first amended complaint, adding M. Sakuma Electrical, Inc. (Sakuma), a construction company, as a defendant and dismissing Morri-

son Knudsen as a defendant.[6] The plaintiffs alleged that the "rock" that struck Pulawa was "a piece of cement [that] originated from a discarded bag of hardened cement which was left in the area [of the accident] or abandoned." The plaintiffs further alleged:

8. Defendants GTE, E.E. Black and/or [Sakuma] performed work in the area [of the accident] or project site prior to [OCC]. Said [d]efendants negligently failed to pick up, clean up or remove the cement bag after completion of their work or portion of work at the job site.

9. Said [d]efendants knew or should have known that the failure to remove a cement bag, or properly clean up the job site, would create a hazardous condition or threaten the safety of other workers on the job site, and therefore the [d]efendants had the duty to remove the cement bag after completion of their portion of work.

The first amended complaint set forth two counts against GTE, E.E. Black, and Sakuma: (1) negligence (Count I); and (2) loss of consortium (Count II). The loss of consortium claim was asserted by Danelle Pulawa on behalf of herself and the Pulawas' two minor children.

On April 5, 2001, Sakuma moved for summary judgment, contending that there was no evidence that the trench excavated by OCC was in the same location where Sakuma had conducted an excavation project sometime in 1994, two years prior to the subject accident. Specifically, Sakuma claimed that "its project area was across the street from the site where [Pulawa] was working and where the cement bag was apparently uncovered." (Emphasis omitted.) On May 8, 2001, the plaintiffs filed a statement of no opposition to Sakuma's motion for summary judgment. On May 9, 2001, E.E. Black and GTE filed their memorandum in opposition

material for purposes of this case whether the employee was operating a backhoe or a hoptoe.

5. According to the plaintiffs' complaint, Morrison Knudsen "is and was at all times material herein, a partnership and successor in interest to or business interest of E.E. Black[.]"

6. Earlier, on May 11, 1999, Morrison Knudsen moved for summary judgment inasmuch as it did

not perform any work in or around the area where the accident occurred. On June 15, 1999, Morrison Knudsen withdrew its motion for summary judgment in light of the parties' stipulation for dismissal without prejudice of all claims against Morrison Knudsen to be filed with the circuit court. On June 17, 1999, the parties filed the aforementioned stipulation.

to Sakuma's motion for summary judgment.[7] On May 30, 2001, the circuit court entered an order granting Sakuma's motion for summary judgment.

On March 10, 2004, GTE moved for summary judgment against the plaintiffs on the basis that "the undisputed facts in this case establish that it cannot be held liable to [the p]laintiffs for 'negligently failing to pick up, clean up or remove the cement bag after completion of their work or portion of their work at the job site' as alleged in [the p]laintiffs' [f]irst [a]mended [c]omplaint." Specifically, GTE maintained that it "did not perform the excavation or backfill work for the earlier project, particularly in the area in question." Rather, GTE asserted that it "contracted with E.E. Black, an independent contractor, to perform duct line work, which involved certain excavation and backfilling work, in 1993."

On March 17, 2004, E.E. Black moved for summary judgment against the plaintiffs on the ground that "it did not owe a legal duty of care to [the p]laintiffs because it was not reasonably foreseeable that [Pulawa] would be injured or subject to an unreasonable risk of harm created by any alleged negligent conduct on the part of E.E. Black relating to the 'large piece of cement' that 'originated from a discarded bag of hardened cement.' " E.E. Black maintained that "[t]here is no

evidence on the basis of which a jury can conclude that E.E. Black knew or had reason to know of a dangerous condition relating to leaving or abandoning a 'discarded bag of hardened cement' underground *and* that the condition created a foreseeable risk of harm to [Pulawa]." (Emphasis in original.)

On April 20, 2004, the circuit court held a hearing on, *inter alia*, GTE's and E.E. Black's motions for summary judgment. At the end of the hearing, the circuit court stated that it was persuaded by the arguments and authorities cited in GTE's and E.E. Black's motions for summary judgment and, thus, orally granted their motions for summary judgment.[8] On May 12, 2004, the circuit court entered its written order granting GTE's and E.E. Black's motions for summary judgment. The circuit court also ruled that GTE's and E.E. Black's joint motion for summary judgment regarding spoliation of evidence was rendered moot by its order granting GTE's and E.E. Black's separate motions for summary judgment.

On May 25, 2004, final judgment was entered in favor of E.E. Black and GTE.[9] On May 27, 2004, E.E. Black and GTE filed their notice of taxation of costs, requesting costs in the amount of $35,509.50, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(d) (2004)[10] and Hawai'i Revised Statutes (HRS)

7. E.E. Black and GTE had previously filed a cross claim against Sakuma on April 24, 2000. In turn, Sakuma had filed a cross claim against E.E. Black on May 23, 2000. Furthermore, on October 13, 2003, E.E. Black and GTE filed a third-party complaint against Universal Electric, Ltd. fka OCC–Electrical, Ltd., a subcontractor of OCC who was performing excavation work at the time Pulawa was injured.

8. Prior to the March 10 and 17, 2004 motions for summary judgment filed by GTE and E.E. Black, respectively, GTE and E.E. Black had filed a joint motion for summary judgment regarding spoliation of evidence. Specifically, GTE and E.E. Black had contended that the hardened bag of concrete that struck Pulawa was "never made available to E.E. Black or GTE for inspection, examination or testing." Although the hardened bag of concrete was photographed after the accident, the bag was apparently thrown away soon after the accident. The motion for summary judgment regarding spoliation of evidence was also to be heard by the circuit court on April 20, 2004. However, inasmuch as the circuit court

orally granted GTE's and E.E. Black's separate motions for summary judgment, the circuit court stated that it was not necessary to address the joint motion for summary judgment regarding spoliation of evidence.

9. The final judgment indicated that, inasmuch as judgment was entered in favor of E.E. Black and GTE, any remaining cross-claims and third-party claims were rendered moot. *See supra* note 7.

10. HRCP Rule 54(d) provides in relevant part:

(d) Costs; attorneys' fees.
(1) COSTS OTHER THAN ATTORNEYS' FEES. Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs[.] . . . Costs may be taxed by the clerk on 48 hours' notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.
(Underscored emphasis and capital letters in original.)

§ 607–9 (1993).[11] On June 3, 2004, costs in the amount of $35,509.50 were taxed by the clerk of the circuit court against the plaintiffs. On June 16, 2004, the plaintiffs filed a motion to disallow costs, contending that it would be inequitable to award costs against the plaintiffs inasmuch as Pulawa remains unemployed and Danelle Pulawa's loss of consortium claim on behalf of herself and the Pulawas' two minor children are merely derivative. The plaintiffs also challenged several entries made by E.E. Black and GTE in their notice of taxation of costs.

At a hearing held on July 27, 2004, the circuit court orally granted in part and denied in part the plaintiffs' motion to disallow costs and entered its written order on August 6, 2004.[12] Specifically, the circuit court denied costs in the amount of $45.95 attributed to meals and granted costs in the amount of $35,463.55. On August 31, 2004, an amended judgment was entered in favor of E.E. Black and GTE, incorporating the circuit court's August 6, 2004 order. On September 7, 2004, the plaintiffs filed their amended notice of appeal.[13]

## II. STANDARDS OF REVIEW

### A. Motion for Summary Judgment

■ This court reviews the circuit court's grant of summary judgment *de novo*. *O'ahu Transit Servs., Inc. v. Northfield Ins. Co.*, 107 Hawai'i 231, 234, 112 P.3d 717, 720 (2005) (citing *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9

(2000)). The standard for granting a motion for summary judgment is well settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 110, 111 P.3d 1, 5 (citation omitted) (brackets in original), *reconsideration denied*, 107 Hawai'i 106, 111 P.3d 1 (2005).

### B. Duty of Care

■ "This court addresses whether a defendant owes a duty of care to a particular plaintiff as a question of law under the right/wrong standard." *Blair v. Ing*, 95 Hawai'i 247, 253, 21 P.3d 452, 458 (2001) (citation omitted).

### C. Taxation of Costs

■ "The award of a taxable cost is within the discretion of the [circuit] court and

---

11. HRS § 607–9 provides:

> No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.
> All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. In determining whether and what costs should be taxed, the court may consider the equities of the situation.

12. On June 4, 2004, the clerk of the circuit court sent a notice to the parties that the instant case

was reassigned to the Honorable Bert Ayabe. As such, Judge Ayabe presided over the plaintiffs' motion to disallow costs.

13. The plaintiffs had prematurely filed a notice of appeal on July 23, 2004, during the pendency of the motion to disallow costs and is considered filed on August 6, 2004, when the order disposing of the motion was entered by the circuit court. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(2) (2004) (providing that, "[i]n any case in which a notice of appeal has been filed prematurely, such notice shall be considered as filed immediately after the time the judgment becomes final for the purpose of appeal"). Consequently, the July 23, 2004 notice of appeal is a timely appeal of the May 25, 2004 final judgment and the August 6, 2004 order granting in part and denying in part the plaintiffs' motion to disallow costs.

will not be disturbed absent a clear abuse of discretion." *Wong v. Takeuchi*, 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998) (internal quotation marks and citation omitted). "An abuse of discretion occurs when the [circuit] court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Hac v. Univ. of Hawai'i*, 102 Hawai'i 92, 101, 73 P.3d 46, 55 (2003) (internal quotation marks and citations omitted).

## III. *DISCUSSION*

On appeal, the plaintiffs challenge the circuit court's order granting summary judgment in favor of E.E. Black and GTE and the order denying in part the plaintiffs' motion to disallow costs. Each of the plaintiffs' contentions will be discussed in turn.

### A. *E.E. Black's Motion for Summary Judgment*

The plaintiffs contend that the circuit court erred in granting summary judgment in favor of E.E. Black because it failed to recognize that E.E. Black

> had a duty to protect against "foreseeable dangers," engaged in negligence notwithstanding the fact that it knew that the "foreseeable range of danger" extended to the public and future contractors, and the "risks or hazards" whose likelihood made the conduct "unreasonably dangerous" included the specific sequence of events that led to ... Pulawa's severe head injuries.

The plaintiffs further argue that the circuit court "failed to consider the material and competent evidence that had been presented and which showed that E.E. Black owed a legal duty to ... Pulawa under the facts and circumstances of this case." The plaintiffs primarily rely on the testimony of Alan Los Banos, Jr., the plaintiffs' construction safety expert, who generally testified in his affidavit and deposition that "burial of objects such as a bag of cement, in lieu of proper fill, creates a risk that a future contractor's heavy construction vehicles or equipment would strike or rollover the object and project it through the air with great force." Thus, the plaintiffs maintain that Los Banos' expert testimony

"alone, at the minimum, created a genuine issue of fact, which precluded summary judgment."

Preliminarily, E.E. Black contends that the plaintiffs confuse the "foreseeability" issue "by citing and referencing 'foreseeability' in the context of a breach of a legal duty and/or causation instead of the context of whether there is a legal duty in the first instance." (Emphases omitted.) Consistent with its assertion that "[f]oreseeability, in the context of a legal duty, is a question of law[,]" E.E. Black argues that "Los Banos' opinions regarding the issue of foreseeability within the context of whether E.E. Black had a legal duty of care owed to [the p]laintiffs should be disregarded, per prevailing case law as they cannot be used or considered to establish a legal duty of care." E.E. Black maintains that it owed no legal duty to the plaintiffs because

> the foreseeable danger or harm related to use of improper backfill for roads pertains to settlement of the road and its failure related to those traveling on or using the road. Voids, settlement, and street failure that possibly could endanger people using and driving on the street are the foreseeable dangers if improper backfill such as a bag of cement is used. The risk or hazard is not that the fill material will be dug up, run over by a vehicle, and projected into the air by the tire of the vehicle. It is a generous stretch of the imagination to conclude *as a matter of law* that the risk or hazard that fill material will be dug up, run over by a vehicle, and projected into the air by the tire of that vehicle is the likely or probable result of the alleged conduct.

(Citations to the record omitted.) (Emphasis in original.)

### 1. **Foreseeability in the Context of Duty**

██ "[I]t is fundamental that a negligence action lies only where there is a duty owed by the defendant to the plaintiff." *Bidar v. Amfac, Inc.*, 66 Haw. 547, 551–52, 669 P.2d 154, 159 (1983) (citations omitted).

The existence of a duty owed by the defendant to the plaintiff, that is, whether ... such a relation exists between the

parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled legal protection at the hands of the defendant, is entirely a question of law.

*Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (internal quotation marks and citations omitted) (ellipsis in original). Regarding the imposition of a duty of care, this court has stated that, generally,

[i]n considering whether to impose a duty of reasonable care on a defendant, we recognize that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. Legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. In determining whether or not a duty is owed, we must weigh the considerations of policy which favor the [plaintiff's] recovery against those which favor limiting the [defendant's] liability. The question of whether one owes a duty to another must be decided on a case-by-case basis.

*Blair,* 95 Hawai'i at 259–60, 21 P.3d at 464–65 (citations omitted) (format altered). In addition to the aforementioned principles, this court has also regarded several factors in determining whether to impose a duty:

[W]hether a special relationship exists, the foreseeability of harm to the injured party, the degree of certainty that the injured party suffered injury, the closeness of the connection between the defendants' conduct and the injury suffered, the moral blame attached to the defendants, the policy of preventing harm, the extent of the burden to the defendants and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.* at 260, 21 P.3d at 465 (ellipsis and citation omitted) (format altered).

Regardless of the source of a particular duty, [however,] a defendant's liability for failing to adhere to the requisite standard of care is limited by the pr[o]position that **the defendant's obligation to refrain from particular conduct** [or, as the circumstances may warrant, to take whatever affirmative steps are reasonable to protect another] **is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct [or omission] unreasonably dangerous.** Thus, if it is not reasonably foreseeable that the particular plaintiff will be injured if the expected harm in fact occurs, the defendant does not owe that plaintiff a duty reasonably to prevent the expected harm.

*Doe Parents No. 1 v. State Dep't of Educ.,* 100 Hawai'i 34, 72, 58 P.3d 545, 583 (2002) (internal quotation marks and citations omitted) (first set of brackets and bold emphases added); *see also Janssen v. Am. Hawai'i Cruises, Inc.,* 69 Haw. 31, 34, 731 P.2d 163, 166 (1987) (stating that "a defendant owes a duty of care only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous") (internal quotation marks and citations omitted); *Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58, 68, 647 P.2d 713, 720 (1982) (same).

■ The test of foreseeability "is whether there is some probability of harm sufficiently serious that a reasonable and prudent person would take precautions to avoid it." *Knodle,* 69 Haw. at 388, 742 P.2d at 385 (internal quotation marks, brackets, and citations omitted). "It does not mean foreseeability of any harm whatsoever, and it is not sufficient that injury is merely possible." *Henderson v. Prof'l Coatings Corp.,* 72 Haw. 387, 396, 819 P.2d 84, 90 (1991) (quoting 65 C.J.S. *Negligence* § 5(5) (1966)) (internal quotation marks omitted); *see also Lee v. Corregedore,* 83 Hawai'i 154, 167, 925 P.2d 324, 337 (1996) ("[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially ac-

ceptable limit on recovery of damages for that injury." (Internal quotation marks and citation omitted.)).

■ "[T]he concept of 'duty[,]' [however,] involves more than mere foreseeability of harm." *Taylor–Rice v. State,* 91 Hawai'i 60, 71–72, 979 P.2d 1086, 1097–98 (1999).

[A] court's task—in determining "duty"—is not to decide [merely] whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.

*Id.* at 72, 979 P.2d at 1098 (citing *Thing v. La Chusa,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 819 n. 3. (1989)) (internal quotation marks and citation omitted).

### 2. Foreseeability in the Context of Duty: Question of Law versus Question of Fact

■ On appeal and at the circuit court level, the parties dispute whether foreseeability is an issue of fact for the trier of fact to decide or is an issue of law for the court to determine. The plaintiffs maintain that "[r]easonable foreseeability is the very prototype of a question that must be left to a jury." (Citation omitted.) On the other hand, E.E. Black maintains that foreseeability in the context of duty is an issue of law for the court to determine.

This court has previously noted that, in the context of determining the existence and scope of a duty, foreseeability is a question of law for the court to resolve. *See Bidar,* 66 Haw. at 553 n. 3, 669 P.2d at 159 n. 3 (noting that foreseeability may "play an important role in the definition of duty and the delineation of its scope by the court") (citing *Hulsman,* 65 Haw. at 68, 647 P.2d at 720–21 (duty owed only to those foreseeably endangered; foreseeability is a question of law); *Ajirogi v. State,* 59 Haw. 515, 527, 583 P.2d 980, 988 (1978) (foreseeability of risk of harm to plaintiff is a question of law when determining whether plaintiff is among those to whom defendant's duty of care extends); *Kelley v.*

*Kokua Sales & Supply, Ltd.,* 56 Haw. 204, 209, 532 P.2d 673, 676 (1975) (as a matter of law, duty not owed to one to whom defendants could not reasonably foresee consequences)). Indeed, other jurisdictions have also recognized that foreseeability, in the context of determining the existence and scope of a duty, is a question of law for the court to determine. *See Ballard v. Uribe,* 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 629 n. 6 (1986); *Knoll v. Bd. of Regents of the Univ. of Neb.,* 258 Neb. 1, 601 N.W.2d 757, 762–63 (1999); *Clohesy v. Food Circus Supermarkets, Inc.,* 149 N.J. 496, 694 A.2d 1017, 1020–21 (1997).

■ Foreseeability, however, in the context of breach of duty and causation is a question of fact for the trier of fact to resolve. *See Bidar,* 66 Haw. at 552–53, 669 P.2d at 159–60. "[T]he distinction between foreseeability as it applies to duty and as it applies to proximate cause is a critical distinction that is too often and too easily overlooked." *Knoll,* 601 N.W.2d at 763.

*Foreseeability as it impacts duty determinations refers to the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care[.]*

Foreseeability that affects proximate cause, on the other hand, relates to the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff reasonably flowed from defendant's breach of duty. Foreseeability in the proximate cause context relates to remoteness rather than existence of a duty.

*Clohesy,* 694 A.2d at 1021 (internal quotation marks and citations omitted) (emphasis added); *see also Knoll,* 601 N.W.2d at 763; *Atl. Mut. Ins. Co. v. Kenney,* 323 Md. 116, 591 A.2d 507, 515 (1991) ("Foreseeability as a factor in the determination of the existence of a duty involves a *prospective* consideration of the facts existing at the time of the negligent conduct. Foreseeability as an element

of proximate cause permits a *retrospective* consideration of the total facts of the occurrence[.]" (Citation omitted.) (Emphases added.)).

■ Here, the plaintiffs have "overlooked" "[t]he distinction between foreseeability as it applies to duty and as it applies to proximate cause." *Knoll*, 601 N.W.2d at 763. For example, the plaintiffs maintain that "[t]he precise manner of the injury or the specific harm or consequence of the negligence need not be foreseeable." However, as E.E. Black points out, "[t]he cases cited by [the p]laintiffs all involve[ ] factual analysis relating to foreseeability in the context of causation," not foreseeability in the context of duty. *See Rogers ex rel. Standley v. Retrum*, 170 Ariz. 399, 825 P.2d 20, 22 (Ct. App.1991) (stating that "the particular manner in which the injury is brought about need not be foreseeable" in the context of "legal cause"); *Tieder v. Little*, 502 So.2d 923, 927 (Fla.Dist.Ct.App.1987) (stating that the "foreseeability aspect of the proximate cause element is … satisfied in this case" because "[t]he collapse of a brick wall resulting in the death of a person near such wall is plainly a reasonably foreseeable consequence of negligently designing and constructing such a wall without adequate supports in violation of applicable building codes"); *Christopher v. Father's Huddle Café, Inc.*, 57 Mass.App.Ct. 217, 782 N.E.2d 517, 526 (2003) (stating that, in the context of causation, "[t]he specific kind of harm need not be foreseeable as long as it was foreseeable that there would be harm from the act which constituted the negligence"). Consequently, to the extent the plaintiffs rely on their cited cases for the proposition that "[t]he precise manner of the injury or the specific harm or consequence of the negligence need not be foreseeable," we disregard them as not germane to the issues presented in the instant appeal. Inasmuch as the issue of foreseeability in the context of duty is a question of law for the court to resolve, the court, not the trier of fact, must determine the existence and scope of duty, if any, owed by E.E. Black to the plaintiffs.

### 3. Duty in the Context of this Case

■ As previously stated, the plaintiffs rely on Los Banos' expert opinion to estab-lish the fact that "[t]he risk of a buried cement bag becoming a projectile was … clearly foreseeable[ ] and not 'highly extraordinary.' " Specifically, Los Banos' affidavit provides in relevant part:

2. I am employed as a Safety Coordinator and Program Specialist for the AFL–CIO, Plasterers & Cement Masons, Local 630, and Bricklayers & Allied Craftworkers, Local 1.

3. I am a safety specialist who investigates construction accidents. I have been so employed over the past nine years, and have worked in the construction field since 1979. My background and experience includes various forms of training in construction and construction safety and OSHA-approved classes. . . .

. . . .

8. In my opinion, it is improper for a contractor to bury objects not consistent with the job specifications as fill materials, such as this object buried under a public roadway such as Kamake'e Street. Such practices have resulted in materials being buried that could pose hazards to future construction workers.

9. The dangers of engaging in such practices would include the risk of heavy construction equipment or vehicles striking or rolling over materials such has [sic] hardened cement so as to project them through the air with great force, jeopardizing the lives and safety of workers and other persons in the immediate area.

On appeal, the plaintiffs argue that Los Banos' "expert testimony established, at least for summary judgment purposes," that:

Burial of objects such as a bag of cement, in lieu of proper fill, creates a risk that a future contractor's heavy construction vehicles or equipment would strike or rollover the object and project it through the air with great force.

Doing so "has the potential for being a projectile that can basically fly."

Heavy construction equipment and "the amount of pressure … can launch" such objects.

"Chunks will fly . . . from the tires, if it spins."

"[W]hen you're on a hard surface and you have a rubberized thing that's pressing down, something has to give. The weak area can be rocks that fly."

"When wheels spin, . . . we see things fly from the tires. Especially in the back, when it spins, the traction, as they're moving, you see it picks up sometimes in the grooves of the tires and just launches itself."

In Hawai'i, construction workers know that such objects can be propelled through the air.

Construction safety training classes are conducted which cover the danger of flying construction debris caused by improper materials that are abandoned or left at a job site.

Indeed, similar incidents have occurred at construction worksites in Hawai'i.

. . . Los Banos has personally seen large rocks fly out from under heavy equipment at construction sites.

A flying object "jeopardizes the lives and safety of workers."

The frequency with which this happens depends on the type of equipment being operated, the speed at which it is being operated, and the type of materials in the vicinity.

E.E. Black, however, maintains that Los Banos' opinions are inadmissible inasmuch as they cannot be used or considered to establish a legal duty of care. In response, the plaintiffs assert that

legal duty must be examined in light of its factual context, not in a vacuum. Mr. Los Banos provided facts relevant to the court's legal duty analysis, and these facts establish some probability of harm sufficiently serious that a reasonable and prudent person (e.g. contractor) would have taken precautions to avoid it.

(Citation omitted.)

Generally, "[t]he testimony of expert witnesses is . . . confined to matters of fact, as distinguished from matters of law." *Create 21 Chuo, Inc. v. Southwest Slopes, Inc.*, 81 Hawai'i 512, 522 n. 4, 918 P.2d 1168, 1178 n. 4 (App.1996). In other words, an "expert or nonexpert opinion that amounts to a conclusion of law cannot be properly received in evidence, since the determination of such questions is exclusively within the province of the court." *Id.* (citation omitted). Nevertheless, in the context of duty, "expert testimony might be relevant to help establish some underlying fact on which duty may ultimately rest[.]" *Parra v. Bldg. Erection Servs.*, 982 S.W.2d 278, 284 (Mo.Ct.App. 1998); *see also Peck v. Horrocks Eng'rs, Inc.*, 106 F.3d 949, 952 (10th Cir.1997) ("Whether a duty of care exists is a question of law, although expert testimony may be helpful on the issue." (Citations omitted.)).

Contrary to the plaintiffs' position, however, Los Banos did *not* "provide[ ] facts *relevant* to the court's legal duty analysis[ ]" in the instant case. (Emphasis added.) A closer examination of Los Banos' deposition testimony reveals that the basis for the "fact" that "[t]he risk of a buried cement bag becoming a projectile was . . . clearly foreseeable[ ] and not 'highly extraordinary' " was Los Banos' prior observations of nine-inch rocks traveling "maybe about five feet, six feet away." Specifically, Los Banos testified:

Q: [By defense counsel] How big was the biggest rock that you've seen fly like that.

[PLAINTIFFS' COUNSEL]: Like that?

[DEFENSE COUNSEL]: Well, when a loader or piece of equipment goes over it and then shoots it out.

[LOS BANOS]: About—I've seen rocks about, roughly, this big fly out of there.

Q: (By [defense counsel] ): When you say "this big"—

A: [By Los Banos] Roughly, what, about nine inches. Around there.

Q: Nine inches, around?

A: Yeah.

Q: How far did it fly?

A: *Usually, it doesn't fly that far. It just flies maybe about five feet, six feet away.*

(Emphasis added.) However, in the present case, the cement "rock" that was propelled into the air weighed approximately thirty

pounds and traveled at least fifteen to twenty-five feet before striking Pulawa in the head. When apprised of these facts, Los Banos testified:

Q: [By defense counsel] *Was this accident, then, unusual?*

A: [By Los Banos] My opinion—*Well, I feel it's unusual.* Especially the launching that far. I thought it was, like, wow, *this is different.*

Q: Going over 20 feet and the thing[, *i.e.,* the concrete "rock"] is, what, 20, 30 pounds—

A: At least, uh-huh.

Q: Unusual accident?

A: That's a big chunk flying there. *Because, usually, when you run over it, it doesn't fly that far.* It just kind of just-Five, six feet. *When it launches that far, it's, like, wow, you know, what is that?*

(Emphases added.) Thus, inasmuch as "[t]he opinion of an expert must pertain to the facts of the particular case[,]" *Tortes v. King County,* 119 Wash.App. 1, 84 P.3d 252, 258 (2003), and Los Banos' opinion does not, his opinion as to the "fact" that "[t]he risk of a buried cement bag becoming a projectile was … clearly foreseeable[ ] and not 'highly extraordinary' " is not helpful to this court's "legal duty analysis." *See Nebraska Plastics, Inc. v. Holland Colors Ams., Inc.,* 408 F.3d 410, 416 (8th Cir.2005) (stating that "[a]n expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported[ ]" and, therefore, "must be excluded"). Accordingly, we next turn to the dispositive issue in this case, that is, whether E.E. Black owed a legal duty of care to Pulawa.

 Other jurisdictions have recognized that "a contractor has a duty to maintain the premises on which it performs work in a reasonably safe condition for persons who the contractor may reasonably expect to come onto the site." *Raimo v. Fischer,* 372 N.J.Super. 448, 859 A.2d 709, 712 (App.Div. 2004) (citation omitted); *see also Chance v. Lawry's, Inc.,* 58 Cal.2d 368, 24 Cal.Rptr. 209, 374 P.2d 185, 190 (1962) (stating that an independent contractor's duty of care is "a general duty imposed by law to use reason-

able care to prevent damage to persons whem [sic] he may reasonably expect to be affected by his work") (internal quotation marks and citation omitted). In other words, a contractor generally

has a duty to use reasonable care both in his or her work and in the course of performance of the work[; h]owever, the duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty.

*Peters v. Forster,* 804 N.E.2d 736, 743 (Ind. 2004) (internal quotation marks, brackets, and citations omitted). Indeed, as previously discussed, this court has held that "the defendant's obligation to refrain from particular conduct … is owed only to those who are foreseeably endangered by the conduct *and only with respect to those risks or hazards whose likelihood made the conduct … unreasonably dangerous.*" *Doe Parents No. 1,* 100 Hawai'i at 72, 58 P.3d at 583 (emphasis added); *see also Janssen,* 69 Haw. at 34, 731 P.2d at 166. Moreover, "in determining the scope of the defendant's duty, the focus is on the defendant's viewpoint, that is, whether the *defendant* could reasonably foresee the plaintiff's injury." *Yager v. Illinois Bell Tel. Co.,* 281 Ill.App.3d 903, 217 Ill.Dec. 695, 667 N.E.2d 1088, 1092 (1996) (citations omitted) (emphasis in original).

Here, Pulawa was standing approximately fifteen to twenty feet away from the excavation area that was located in the same vicinity of an excavation site of a prior construction project that was backfilled by E.E. Black two years earlier. Although E.E. Black "has a duty to use reasonable care in both [its] work and in the course of performance of the work[,]" it cannot be said that Pulawa was foreseeably endangered by E.E. Black's conduct such that the cement bag it allegedly failed to remove would be propelled in the air by the tire of a loader and strike Pulawa in the head. The plaintiffs adduced testimony from several GTE inspectors and engineers, as well as an E.E. Black project engineer, who purportedly oversaw the 1993–1994 underground duct line project. The testimony focused on the risks or hazards created by E.E. Black's alleged failures to

remove the cement bag and to comply with contract specifications regarding proper backfill requirements. The risk or hazard that was consistently identified focused on the possibility of settlement of the road and street failure. In fact, the plaintiffs, in their memorandum in opposition to E.E. Black's motion for summary judgment, posited that "[a]ppropriate backfill is necessary to assure 'the integrity of the pavement structure,' while inappropriate fill can promote voids or settlement and allow for failure of the roadway." (Citation omitted.) The plaintiffs also argued that "[u]se of improper fill by [E.E. Black] under a public roadway such as Kamakeʻe Street could lead to settlement and road failure." (Citations omitted.) The GTE inspector who oversaw the underground duct line project in 1993–1994 testified that compliance with contract specifications regarding proper backfill requirements is to prevent "settlement and/or street failure." Indeed, the plaintiffs' own expert, Los Banos, confirmed that the purpose of job specifications relating to proper backfill requirements is to promote "uniform compaction," which, in turn, prevents "voids." Moreover, Los Banos testified that the purpose of such job specifications is *not* to prevent the possibility of non-conforming backfill material being unearthed and projected into the air, striking somebody:

Q: [By defense counsel] So the purpose for designating specifically the size of backfill materials is so that there is proper compaction?

A: [By Los Banos] Uniform compaction.

Q: The purpose for those specifications are not so that it does impose a danger to others, right?

A: What do you mean? For the size, you mean?

Q: Yes.

A: Yeah. No.

Q: *That has nothing to do with, well, you know, if you leave rocks about five, 10 inches in there[, i.e., in the trench,] and if somebody digs it out it might hit somebody?*

A: *No.* It's just engineering standards. You know, you're talking about dynamics.

(Emphases added.)

Although the plaintiffs adduced some testimony that improper backfill could potentially pose a danger to the safety of future contractors and that E.E. Black was generally aware that there would be future underground work along Kamakeʻe Street, such evidence does not meet the test of foreseeability, to wit, "whether there is *some probability of harm sufficiently serious* that a reasonable and prudent person would take precautions to avoid it." *Knodle,* 69 Haw. at 388, 742 P.2d at 385 (internal quotation marks, brackets, and citations omitted) (emphasis added). The aforementioned test "does not mean foreseeability of *any* harm whatsoever, and it is not sufficient that injury is merely possible." *Henderson,* 72 Haw. at 396, 819 P.2d at 90 (internal quotation marks and citation omitted) (emphasis added); *see Ethyl Corp. v. Johnson,* 345 Ark. 476, 49 S.W.3d 644, 648 (2001) (recognizing that "there is no duty to guard against merely possible, as opposed to likely or probable, harm"). Based on the evidence in the record, it appears that, although Pulawa did indeed suffer harm, such harm, though unfortunate, was "merely possible" and not "likely or probable" under the circumstances of this case.

Furthermore, the authorities relied upon by the plaintiffs regarding contractors all involve the type of *foreseeable* harm related to excavation and resurfacing work, that is, settlement, street failure, and holes. *See Brent v. Unicol, Inc.,* 969 P.2d 627, 628 (Alaska 1998) (subsequent construction worker fell into a hole between an excavation wall and a rig mat left by a prior contractor); *McMahon v. Richard Gorazd, Inc.,* 135 Ill. App.3d 211, 89 Ill.Dec. 944, 481 N.E.2d 787, 791–93 (1985) (painter fell from scaffold after ground under scaffold caved in where utility had earlier installed underground gas line; utility was under a duty to prevent or correct subsidence at the site of its excavations and could discharge such duty by, *inter alia,* "filling in any subsidence caused by the *expected* settling of the earth after such an

excavation") (emphasis added); *Hankins v. Elro Corp.*, 149 Mich.App. 22, 386 N.W.2d 163, 164 (1986) (per curiam) (bicycle on which plaintiff was riding struck a gap between two pieces of cement); *Kapalczynski v. Globe Constr. Co.*, 19 Mich.App. 396, 172 N.W.2d 852, 852–53 (1969) (plaintiff fell into a hole in a street that defendant had resurfaced). The plaintiffs' two remaining cases dealt with foreseeable harm relating to the improper installation of furniture and containers. *See Chance*, 24 Cal.Rptr. 209, 374 P.2d at 187 (diner fell into open planter box installed in a narrow foyer of a busy restaurant); *Raimo*, 859 A.2d at 711 (plaintiff descending temporary staircase injured when staircase fell away from a house). Thus, the evidence adduced below, coupled with the arguments of the parties, clearly established that the risk or hazard of the buried cement bag being propelled into the air during a future excavation was *not* what made the failures to remove the cement bag and to comply with the contract specifications by E.E. Black unreasonably dangerous. In other words, E.E. Black's general duty to use reasonable care did not include within its scope the protection of Pulawa from the particular risk that he encountered. *See Selwyn v. Ward,* 879 A.2d 882, 883, 887–89 (R.I.2005) (holding that harm resulting from a minor igniting a bottle of grain alcohol for sport was not a foreseeable consequence of selling alcohol to a minor; rather, foreseeable consequence would have been injuries resulting from minor's consumption of illegally obtained alcohol). Consequently, based on the state of the record, it cannot be said that E.E. Black owed a legal duty to the plaintiffs. Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of E.E. Black.[14]

B. *GTE's Motion for Summary Judgment*

■ The plaintiffs contend that the circuit court erred in granting summary judgment in favor of GTE because GTE is liable for (1) E.E. Black's acts and omissions and (2) its own acts and omissions. Specifically, the plaintiffs assert that "the evidence shows that GTE established sufficient control over E.E. Black to render GTE liable for the acts and omissions of E.E. Black" inasmuch as "GTE had an employee on the job site daily overseeing the progress of the construction[.]" Although not entirely clear from their opening brief, it appears from their reply brief that the plaintiffs allege that GTE is liable for its own acts and omissions based on negligent supervision of E.E. Black.

■ Inasmuch as E.E. Black did not owe a legal duty to the plaintiffs, it follows that GTE likewise would not be liable to the plaintiffs for E.E. Black's alleged acts and/or omissions in "fail[ing] to pick up, clean up or remove the cement bag after completion of their work or portion of work at the job site." Moreover, because "negligent supervision may only be found where an employee is acting *outside* of the scope of his or her employment," *Dairy Road Partners v. Island Ins. Co.*, 92 Hawai'i 398, 427, 992 P.2d 93, 122 (emphasis in original), *reconsideration denied,* 92 Hawai'i 398, 992 P.2d 93 (2000), and the plaintiffs do not allege that E.E. Black was acting *outside* the scope of its alleged employment with GTE, the plaintiffs' complaint cannot be said to state a claim for negligent supervision. Accordingly, we hold that the circuit court did not err in

14. The plaintiffs argue for the first time on appeal in their reply brief that E.E. Black "purported to prove the facts underlying its motion [for summary judgment] by attaching deposition transcripts that were authenticated improperly by their attorney." Inasmuch as "[t]he inadmissibility of evidence is a sufficient basis to reverse summary judgment," the plaintiffs contend that "a Hawai'i appellate court can review the admissibility of documents 'sua sponte,' even if the issue was not raised below." In support of their contention, the plaintiffs rely on *Nakato v. Macharg,* 89 Hawai'i 79, 88, 969 P.2d 824, 833 (App.1998). *Nakato,* however, does not support the plaintiffs' contention. In *Nakato,* the appel-

lants challenged the admissibility of the exhibit at issue at the hearing on the motion for summary judgment. *Id.* at 89, 969 P.2d at 834. As such, the appellants in *Nakato* properly preserved their right to challenge the admissibility of the exhibit on appeal. Here, the plaintiffs essentially concede that they failed to challenge E.E. Black's exhibits at the circuit court level. Consequently, they are precluded from challenging such exhibits for the first time on appeal. *See Acoba v. Gen. Tire, Inc.,* 92 Hawai'i 1, 12, 986 P.2d 288, 299 (1999) (precluding appellant from challenging the admissibility of appellee's affidavits on appeal when appellant failed to make an objection at the circuit court level).

granting summary judgment in favor of GTE.

## C. *Taxation of Costs*

■ Lastly, the plaintiffs assert that the circuit court abused its discretion by denying in part their motion to disallow costs because: (1) the circuit court's award of summary judgment in favor of E.E. Black and GTE was erroneous; (2) it was inequitable to award costs in light of Pulawa's unemployment and limited means; and (3) joint and several liability for costs should not be imposed against Danelle Pulawa and the Pulawas' two minor children in light of the fact that their claims are derivative. E.E. Black and GTE, on the other hand, contend that HRCP Rule 54(d) creates a "strong presumption" that the prevailing party will recover costs, and "[a]ctual indigency, not merely limited financial resources, must be demonstrated." Inasmuch as Pulawa "receives Social Security benefits (approximately $1,500 per month), benefits from the Operating Engineers Trust Funds, and workers' compensation benefits," E.E. Black and GTE claim that the plaintiffs have not shown that they were incapable of paying the costs awarded to E.E. Black and GTE. Moreover, E.E. Black and GTE contend that HRCP Rule 54(d) "does not distinguish between derivative and non-derivative claims[,]" and, thus, costs were properly awarded against all the plaintiffs.

■ As previously stated, E.E. Black and GTE filed their notice of taxation of costs pursuant to HRCP Rule 54(d) and HRS § 607–9. HRCP Rule 54(d) provides that, "[e]xcept when express provision therefor is made either in a statute or in these rules, costs *shall* be allowed as of course to the prevailing party unless the court otherwise

directs[.]" (Emphasis added.) HRCP Rule 54(d)

> creates a strong presumption that the prevailing party will recover costs.... The presumption that the prevailing party is entitled to costs must be overcome by *some showing that an award would be inequitable under the circumstances.* The losing party bears the burden of making this showing.

*Wong v. Takeuchi*, 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998) (quoting 10 Moore's Fed. Prac. § 54.101(1)(a-b) (3d ed.1998)) (emphasis added). HRS § 607–9 provides that:

> No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.

> All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. *In determining whether and what costs should be taxed, the court may consider the equities of the situation.*

(Emphasis added.)

> Several courts of appeals have held that indigency, or modest means, is a factor that a district court may consider in awarding costs [pursuant to Federal Rules of Civil Procedure (FRCP) Rule 54(d).[15]] *See, e.g., Cherry v. Champion Int'l Corp.,* 186 F.3d 442, 447 (4th Cir.1999) (evaluating whether a non-indigent losing plaintiff had the "effective ability to satisfy [the defendant's] bill of costs" or was "of such mod-

---

15. FRCP Rule 54(d) provides in relevant part:

> **(1) Costs Other than Attorneys' Fees.** Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion

served within 5 days thereafter, the action of the clerk may be reviewed by the court.

(Bold emphasis in original.) This court has previously noted that FRCP Rule 54(d) is "functionally identical" to HRCP Rule 54(d). *Wong,* 88 Hawai'i at 52 n. 4, 961 P.2d at 617 n. 4. "Where a Hawai'i rule of civil procedure is identical to the federal rule, the interpretation of this rule by federal courts is highly persuasive." *Id.* (internal quotation marks and citation omitted).

est means that it would be unjust or inequitable to enforce [FRCP] Rule 54(d)(1) against her"); *Weeks v. Samsung Heavy Indus. Co., Ltd.,* 126 F.3d 926, 945 (7th Cir.1997) ("[T]he losing party's inability to pay will suffice to justify denying costs."). Other courts that have adopted this approach also caution that a losing party's indigency or an inability to pay costs does not automatically mean that a costs award levied against that party is inequitable. *See, e.g., Weaver v. Toombs,* 948 F.2d 1004, 1008 (6th Cir.1991)[, *superseded by statute as stated in In re Prison Litigation Reform Act,* 105 F.3d 1131 (6th Cir.1997)] (holding that indigency *may* be a shield to imposition of costs, but that it is not an absolute shield). This case-by-case approach to the "indigency" factor has also been expressly or implicitly endorsed by noted commentators on the subject. *See, e.g.,* 10 Moore's [Fed. Prac.] §§ 54.101[1][b], at 54–153, 54.104[1][a]-[c], at 54–198 to 54–201 [ (3d ed.1999) ]; 10 Wright[, Miller & Kane, Fed. Prac. & Procedure] § 2673, at 305–09 [ (3d ed.1998) ].

*In re Paoli R.R. Yard PCB Litig.,* 221 F.3d 449, 463 (3d Cir.2000) (emphasis in original); *see also Whitfield v. Scully,* 241 F.3d 264, 270 (2d Cir.2001) (stating that, "[a]s a general matter[,] a district court may deny costs on account of a losing party's indigency, but indigency *per se* does not automatically preclude an award of costs"); *Chapman v. AI Transp.,* 229 F.3d 1012, 1039 (11th Cir.2000) (en banc) (holding that "a non-prevailing party's financial status is a factor that a district court may, but need not, consider in its award of costs pursuant to [FRCP] Rule 54(d)"). In *In re Paoli,* the United States Court of Appeals for the Third Circuit (Third Circuit) held that, "if a losing party is indigent or unable to pay the full measure of costs, a district court *may,* but need not *automatically,* exempt the losing party from paying costs." 221 F.3d at 464 (emphases in original). In so holding, the Third Circuit stated:

Such an approach is somewhat at odds with the traditional rule at law that the prevailing party was automatically entitled to its costs, but it is consistent with the rule at equity that the district court exercise its discretion to insure that the award be equitable. Allowing for the indigency factor in certain cases is also in keeping with the American tradition of not providing total reimbursement.... [T]he types of costs recoverable under [FRCP] Rule 54(d)(1) are quite circumscribed. These costs do not include such litigation expenses as attorney's fees and expert witness fees in excess of the standard daily witness fee, and as a result, while a prevailing party is awarded its [FRCP] Rule 54(d)(1) costs, those costs often fall well short of the party's actual litigation expenses[.]

*Id.* (internal quotation marks and citations omitted). Nevertheless,

[i]f a district court[,] in determining the amount of costs to award[,] chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay. *See McGill [v. Faulkner* ], 18 F.3d [456,] 459 [ (7th Cir.1994) ] (non-prevailing party offered no documentary support, relying instead on "unsupported, self-serving statements"); *Cherry,* 186 F.3d at 447 (no reduction in cost award despite proof that plaintiff had "no independent income and owned no property in her own name" because she had "sufficient access to marital property" and a 401(k)plan).

*Chapman,* 229 F.3d at 1039; *see also Corder v. Lucent Techs. Inc.,* 162 F.3d 924, 929 (7th Cir.1998) (stating that the burden is on the non-prevailing party to provide evidence of inability to pay sufficient to overcome the presumption that the prevailing party is entitled to recover costs); 10 Moore's Fed. Prac. § 54.101[1][b], at 54–154 to 54–155 (3d ed.2006) (stating that "[a] substantiated claim of the losing party's indigency may justify a reduction or denial of costs to the prevailing party, although such indigency is not an absolute shield to the imposition of costs") (footnotes omitted).

Moreover, the non-prevailing party must show more than a mere "drop in income" to substantiate his or her claim of indigency because such fact alone informs the court nothing of the non-prevailing party's "other

financial resources." *Corder*, 162 F.3d at 929; *see also* 10 Moore's Fed. Prac. § 54.101[1][b], at 54–155. *Cf. McGill*, 18 F.3d at 459 (stating that incarceration alone is inadequate to show indigence). In *A.D. v. Deere & Co.*, 229 F.R.D. 189 (D.N.M.2004), the prevailing parties moved for costs against the non-prevailing parties pursuant to FRCP Rule 54(d). *Id.* at 192. The non-prevailing parties (A.D. and Sue Richins and Sue Richins as next friend of Arthur Dloyd Richins, Jr.) [16] [hereinafter, collectively, the Richins] contended that costs should not be taxed against them inasmuch as "they currently have no earned income, and that they subsist on social security and worker's compensation." *Id.* In addition, the evidence in the case reflected that the Richins' future medical expenses, not all of which would be covered by worker's compensation, would exceed $2,000,000. *Id.* The Richins argued that they had " 'practically' no ability to adequately care for A.D. Richards and thus cannot pay the [prevailing parties]' costs." *Id.* The United States District Court for the District of New Mexico (the court) held that, inasmuch as the Richins failed to overcome the presumption that the prevailing parties would recover costs, they did not demonstrate why the court should not award costs against the Richins. *Id.* at 193. Specifically, the court stated:

> The Richins' claimed indigency is not an absolute shield to the award of costs. Moreover, the Richins have not shown that they are indigent such that the [c]ourt should not tax costs. It may well be that the Richins are unable to pay the costs. But given the record before the [c]ourt, the [c]ourt would be speculating to so find. While there certainly was evidence at trial that A.D. Richins' medical bills will be

considerable, and that his earning capacity is limited, the [c]ourt does not recall evidence about the Richins['] assets. Normally, a balance sheet of the plaintiffs would not be relevant. At this stage, however, that information is needed. While the [c]ourt assumes that the Richins are of moderate means, they have not provided the detailed and specific information that the [c]ourt could use to determine whether they could pay an $8,000 cost bill.

*Id.* at 193–94 (citation omitted); *see also Corder*, 162 F.3d at 929 (holding that the trial court did not abuse its discretion when it refused to modify its costs order despite the losing party's allegation that her income had decreased).

Similarly, in the instant case, the evidence adduced at the circuit court level regarding the Pulawas' inability to pay costs taxed against them revealed that, as a result of Pulawa's severe head and brain injuries, he remains unemployable eight years after the accident. The Pulawas claim that they receive Social Security benefits, Operating Engineers Trust Funds benefits, and workers' compensation benefits.[17] Finally, the Pulawas presented evidence that their taxable income in 2003 totaled $25,534. However, such evidence alone does not inform the court of the Pulawas' other financial resources. *See Corder*, 162 F.3d at 929; 10 Moore's Fed. Prac. § 54.101[1][b], at 54–155. Indeed, the Pulawas did not present any evidence about their assets. In other words, the circuit court was presented with evidence of the Pulawas' income stream after the accident, but not any evidence of the Pulawas' income stream prior to the accident and accumulation thereof. *See, e.g., Broccoli v. Echostar Communications Corp.*, 229 F.R.D.

---

**16.** Although not stated in the opinion, it appears that the non-prevailing parties consist of a husband, wife, and the wife as next friend of a minor, presumably the child of the husband and wife. *See id.* at 191. It appears that the underlying action stemmed from an accident in which the purported husband, A.D. Richards, sustained personal injuries as a result of operating excavation machinery. *See Richins v. Deere & Co.*, 231 F.R.D. 623, 624 (D.N.M.2004).

**17.** On appeal, the plaintiffs do not indicate how much they receive each month from the three

sources of income. A letter from the Social Security Administration to the Pulawas, dated December 21, 1997, reveals that the Pulawas were to receive $14,190 on or about December 27, 1997 and $1,448 on or about the third Wednesday of each month thereafter. The plaintiffs did not provide any documentation showing the amount they receive each month from the Operating Engineers Trust Funds and workers' compensation. Although not entirely clear from the record, it appears that Pulawa also receives a monthly pension.

506, 517 (D.Md.2005) (district court concluding that losing party presented sufficient evidence of inability to pay costs due to low income and lack of any assets). In ruling on the plaintiff's motion, the circuit court stated that it had "reviewed the motion [to disallow costs] and heard the arguments" made by the parties, which focused on the plaintiffs' inability to pay. In taxing costs against the plaintiffs, the circuit court implicitly determined that the plaintiffs failed to rebut "[t]he presumption that the prevailing party is entitled to costs" "by some showing that an award would be inequitable under the circumstances." *Wong*, 88 Hawai'i at 52, 961 P.2d at 617. Therefore, inasmuch as the decision to award costs is discretionary and the circuit court "may," but need not, "consider the equities of the situation," HRS § 607–9, we cannot say that the circuit court's refusal to grant the plaintiffs' motion to disallow costs was an abuse of discretion in this case.

The concurring and dissenting opinion (the dissent), however, maintains that, because "HRCP Rule 54 is subject to HRS § 607–9," "[l]imitations on the trial court's consideration 'of the equities of the situation' would violate the express language in HRS § 607–9." Dissent at 25, 143 P.3d at 1227. As such, the dissent proposes that trial courts may consider (1) "the chilling effect [that] a disproportionate award of costs may have on a person's right to bring suit," dissent at 26, 143 P.3d at 1228, and (2) "the relative disparity of wealth between parties," dissent at 25–26, 143 P.3d at 1227–28, in determining whether to assess costs pursuant to HRS § 607–9. Here, the plaintiffs on appeal never argued that: (1) imposing costs against them would result in a chilling effect on a person's right to bring suit; and (2) "relative disparity of wealth between parties" is a factor to be considered in determining whether to award costs. In fact, the entirety of the plaintiffs' argument pertaining to the circuit court's consideration of the equities in determining whether to assess costs against them states:

> Evidence that an award is inequitable under the circumstances can provide a basis for denying costs. *Wong v. Takeuchi*, 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998) (citing 10 Moore's Fed[.] Prac[.] § 54.101(1)(a-b) (3d ed.1998)).

The most important equitable factor is indigency or inability to pay. *In re Paoli Railroad Yard PCB Litigation*, 221 F.3d 449, 463 (3rd Cir.2000). Such inability to pay permits a court to exempt the party from paying costs. *Id.* at 464.

The court awarded $35,463 in costs against [the plaintiffs]. This award was an abuse of discretion and both inequitable and erroneous.

Ben Pulawa sustained severe and permanent head and brain injuries and remains unemployable eight years later. His continued existence depends upon disability benefits from the Social Security Administration, Operating Engineers Trust Funds, and workers' compensation benefits. He has not been cleared for any form of employment over the past 8 years and has no prospect of becoming employable in the future.

(Citations to the record omitted.) Under the circumstances of this appeal, we, therefore, decline to consider any theories not advanced by the plaintiffs.

■■■ Finally, the dissent maintains that "remand is necessary in this case[ ]" because "fairness ... dictates that [the p]laintiffs be given the opportunity ... to show whether their assets are insufficient to satisfy [the] costs [taxed against them]." Dissent at 27–28, 143 P.3d at 1229–30. However, as the dissent points out, the plaintiffs already had the opportunity to support their position before the circuit court, namely, that "[c]ompelling equitable circumstances weigh heavily in favor of disallowing an award of costs[.]" Dissent at 27–28 n. 2, 143 P.3d at 1229–30 n. 2 (citation omitted). It was up to the plaintiffs to support their position in the first instance by adducing sufficient evidence to demonstrate a "true inability to pay." *Chapman*, 229 F.3d at 1039 (citations omitted). It may well be that the Pulawas are, in fact, unable to pay the assessed costs; nevertheless, given the state of the record, we defer, as we must, to the discretion of the circuit court in implicitly determining that the Pulawas failed to meet their burden of overcoming the strong presumption that E.E. Black

and GTE, as the prevailing parties, recover costs pursuant to HRCP Rule 54(d). Indeed, as the Ninth Circuit has recognized:

> Although a district court must "specify reasons" for its refusal to tax costs to the losing party, we have never held that a district court must specify reasons for its decision to abide the presumption and tax costs to the losing party. The distinction is critical. A district court deviates from normal practice when it refuses to tax costs to the losing party, and that deviation triggers the requirement to "specify reasons."
>
> . . . .
>
> The requirement that district courts give reasons for denying costs flows logically from the presumption in favor of costs that is embodied in the text of the rule[, *i.e.*, FRCP Rule 54(d) ]; if a district court wishes to depart from that presumption, it must explain why so that the appellate court will be able to determine whether or not the trial court abused its discretion. . . . Our requirement that a district court give reasons for denying costs is, in essence, a requirement that the court explain why a case is not ordinary.
>
> This reasoning suggests, as we hold today, that a district court need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award. *The presumption itself provides all the reason a court needs for awarding costs, and when a district court states no reason for awarding costs, we will assume it acted based on that presumption.*
>
> . . . .
>
> [T]he district court needs no affirmatively expressed reason to tax costs. Rather, it need only conclude that the reasons advanced by the party bearing the burden—

the losing party—are not sufficiently persuasive to overcome the presumption. In the circumstances of this case, the presumption itself provided an adequate reasons for the district court to award costs. We decline to adopt a rule that would place on district courts the burden of justifying routine awards of costs against losing parties[.]

*Save Our Valley v. Sound Transit*, 335 F.3d 932, 945–46 (9th Cir.2003) (citations and some emphasis omitted) (some ellipses and emphasis added). We likewise decline to adopt a rule that would place on circuit courts the burden of justifying a routine award of costs against losing parties. Such a burden may be incurred if we remand the instant case for a redetermination of the assessment of costs as the dissent would have it. Dissent at 27–28, 143 P.3d at 1229–30.

▆▆ Accordingly, notwithstanding that the circuit court may, but need not automatically, exempt the plaintiffs from paying costs, we believe that the circuit court did not abuse its discretion in taxing costs against the plaintiffs. We, therefore, hold that the circuit court did not abuse its discretion in denying the plaintiffs' motion to disallow costs.[18]

## IV. CONCLUSION

Based on the foregoing, we affirm the circuit court's May 25, 2004 final judgment.

Concurring and Dissenting Opinion by ACOBA, J.

I concur with upholding the grant of summary judgment by the first circuit court (the court) on the ground that the basic propositions set out by the majority were first set out in *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970), and have been restated in

---

[18]. The plaintiffs also contend that costs should not be taxed against them jointly and severally. Their contention is seemingly based on their belief that, because Danelle Pulawa's loss of consortium claim on behalf of herself and the Pulawas' two minor children are merely derivative, such claims "caused [E.E. Black and GTE] to incur no or minuscule costs." However, as previously stated, "[t]he award of a taxable cost is within the discretion of the [circuit] court and

will not be disturbed absent a clear abuse of discretion." *Wong*, 88 Hawai'i at 52, 961 P.2d at 617 (internal quotation marks and citation omitted). Inasmuch as the general rule is that a court "may apportion costs between the prevailing and non-prevailing parties as it sees fit[,]" *In re Paoli*, 221 F.3d at 469 (citations omitted), we believe that the circuit court did not abuse its discretion in deciding to impose costs jointly and severally in the instant case.

subsequent cases. However, I respectfully dissent as to the majority's limitation on the "equities" that may be considered by trial courts under the express grant of discretion given by Hawai'i Revised Statutes (HRS) § 607–9 (1993). For that reason I would remand on the question of costs.

## I.

First, the general tort principles set forth by the majority were established long ago in *Rodrigues.* In *Rodrigues* this court said, as to duty arising in a negligence case, that (1) "[d]uty ... is a legal conclusion which depends upon 'the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection[,]' " *id.* at 170, 472 P.2d at 518 (quoting Prosser, Torts § 53 at 332 (3d ed.1964)); *compare* majority opinion at 12, 143 P.3d at 1214, (2) "in determining the duty imposed on the defendant, if any, we must weigh the considerations of policy which favor the plaintiff's recovery against those which favor limiting the defendant's liability[,]" *Rodrigues,* 52 Haw. at 170, 472 P.2d at 519; *compare* majority opinion at 12, 143 P.3d at 1214, (3) "the question of whether the defendant is liable to the plaintiff in any particular case will be solved most justly by the application of general tort principles[,]" *Rodrigues,* 52 Haw. at 174, 472 P.2d at 520; *compare* majority opinion at 12, 143 P.3d at 1214, (4) "a further limitation on the right of recovery, as in all negligence cases, is that the defendant's obligation to refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous[,]" *id.* at 174, 472 P.2d at 521; *compare* majority opinion at 12, 13, 143 P.3d at 1214–15, and (5) "the trial court must ... decide whether, under the facts of [the] case, [the injury] to the plaintiff was a reasonably foreseeable consequence of the defendant's act[,]" *Rodrigues,* 52 Haw. at 174, 472 P.2d at 521, for "where the preliminary issue of whether the case presents questions on which reasonable men would disagree is for the court[,]" *id.* at 175 n. 8, 472 P.2d at 521 n. 8; *compare* majority opinion at 13, 143 P.3d at 1215. Hence, "the [majority's] foregoing

formulation rests on the precepts in *Rodrigues.*" *Guth v. Freeland,* 96 Hawai'i 147, 160, 28 P.3d 982, 995 (2001) (Acoba, J., concurring and dissenting).

## II.

Second, I cannot agree with the majority's holding that Plaintiffs–Appellants Benjamin Pulawa, III (Benjamin) and Danelle Pulawa, individually and as Prochein Ami for Darcie Pulawa and Benjamin Pulawa, IV (collectively, Plaintiffs) "failed to meet their burden of overcoming the strong presumption that [Defendants–Appellees E.E. Black and GTE Hawaiian Tel] ... recover costs pursuant to [Hawai'i Rules of Civil Procedure (HRCP)] Rule 54(d) [ (2006) ]." Majority opinion at 22, 143 P.3d at 1224. I would remand the court's order on costs for reconsideration because (1) the majority adopts a new rule that courts may, but are not required to, consider indigency as a factor in awarding costs, a rule which did not exist before the court's order, (2) in that regard, a party is required to make a showing as to assets in order to prove indigency, and (3) the majority assigns a dispositive role to whether evidence was adduced concerning Plaintiffs' assets in this case—a matter which apparently was not considered below by the parties or the court.

## III.

HRCP Rule 54(d) states in relevant part:

**(d) Costs; attorneys' fees.**

(1) COSTS OTHER THAN ATTORNEYS' FEES. *Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs;* but costs against the State or a county, or an officer or agency of the State or a county, shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on 48 hours' notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

(Emphasis added.) (Boldfaced font in original.) In that regard, HRS § 607–9, entitled "Cost charges exclusive; disbursements," vests a court with discretion to do equity

with regard to taxation of costs. HRS § 607–9 states:

No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.

All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. *In determining whether and what costs should be taxed, the court may consider the equities of the situation.*

(Emphasis added.) Thus, when payment of costs are requested, a court retains discretion as to equitable factors. HRCP Rule 54 is subject to HRS § 607–9. On its face, HRS § 607–9 vests the court with discretion to award costs based on an examination of the "equities of the situation." Hence, the legislature, in enacting HRS § 607–9, mandated in its wisdom that the "situation[ ]" should govern. It did not specifically limit the nature or scope of the "equities" to be considered by the court. Therefore, limitations on the trial court's consideration "of the equities of the situation" would violate the express language in HRS § 607–9.

When an award of costs would be inequitable, then, there is no presumption that the costs will be granted as of course. In *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 463 (3d Cir.2000), cited by the majority, the appellate court explained that,

[r]eported cases have discussed *a number of equitable factors ... that a district court may consider in determining a costs award. ... These factors include:* (1) the unclean hands, or bad faith or dilatory tactics, of the prevailing party; (2) the good faith of the losing party and the closeness and difficulty of the issues they raised; (3) *the relative disparity of wealth between the parties;* and (4) *the indigence or inability to pay a costs award by a losing party.*

(Emphases added.) Factors such as those in *Paoli* should be viewed as examples of and not as limitations on equitable matters a court may consider.

IV.

The majority relies on *Paoli* for the proposition that a court may, but is not required to consider a party's indigency in determining whether costs be imposed. Majority opinion at 22, 143 P.3d at 1224. As earlier noted, *Paoli* lists other equitable factors to consider including, *inter alia*, "the relative disparity of wealth between parties." 221 F.3d at 463. Other courts have considered this as an equitable factor. *See, e.g., Schaulis v. CTB/McGraw–Hill, Inc.*, 496 F.Supp. 666, 680 (N.D.Cal.1980) (noting that, where there is a "wide disparity in economic resources" between parties, a party's indigence is a proper ground for denying costs); *Key v. Chrysler Motors Corp.*, 998 P.2d 575, 579 (N.M.2000) (recognizing disparity in wealth between parties as a factor in determining costs, but reversing trial court's disallowance of costs as an abuse of discretion inasmuch as losing party "failed to present any evidence regarding the disparity in size and resources between the two parties or evidence regarding a chilling effect on future litigation"); *cf. Faraci v. Hickey–Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir.1979) (stating that, "because fee awards are at bottom an equitable matter, ... courts should not hesitate to take the relative wealth of the parties into account"); *Toliver v. County of Sullivan*, 957 F.2d 47, 49 (2d Cir.1992) (noting that, in awarding fees, "courts should not hesitate to take the relative wealth of the parties into account" (citation and internal quotation marks omitted)); *Munson v. Friske*, 754 F.2d 683, 697 (7th Cir.1985) (stating that fee awards are equitable matters permitting the court "to consider the relative wealth of the parties" and the plaintiff's ability to pay). In *Schaulis*, the plaintiff was an individual litigant and the prevailing defendant was a large corporation. The *Schaulis* court recognized that "[t]here is no question that costs normally are awarded to the prevailing party in litigation. However, the district court, by the words of the rule itself, retains discretion

in determining whether or not to award costs." 496 F.Supp. at 680. The district court noted that there is a presumption that the prevailing party is entitled to costs even when the losing party acts "honestly and ethically." *Id.* However, that court further elaborated that, although "good faith litigation does not absolve a party from imposition of costs, ... [i]ndigency is a proper ground for denying costs in cases where there is a wide disparity of economic resources between the parties." *Id.* (internal quotation marks and citations omitted). Hence, evaluation of an alleged disparity in financial means is an equitable factor that may be considered by the court as embodied in authority relied on by the majority.

## V.

Another factor that courts have weighed is the chilling effect a disproportionate award of costs may have on a person's right to bring suit. In denying costs to the prevailing defendant, the *Schaulis* court stated that, "[t]his case has been vigorously litigated, and this Court concludes that it would place an undue burden to tax costs against plaintiff. To do so in this context could only chill individual litigants of modest means seeking to vindicate their individual and class rights under the civil rights laws." *Id.; see also Stanley v. Univ. of S. Cal.,* 178 F.3d 1069, 1079 (9th Cir.1999) (concluding that "the district court abused its discretion, particularly based on the district court's failure to consider two factors: Stanley's indigency, and the chilling effect of imposing such high costs on future civil rights litigants"); *United States ex rel. Pickens v. GLR Constructors, Inc.,* 196 F.R.D. 69, 77 (S.D.Ohio 2000) (denying assessment of costs because "there would be a significant 'chilling effect' on future relators if this Relator is assessed the ... costs as asserted by Defendant because they may be persuaded from bringing complex and expensive [False Claims Act] actions, especially if future relators face the risk of paying substantial litigation costs to a prevailing defendant"); *In re L.B.,* 651 So.2d 1274, 1275

(Fla.Dist.Ct.App.1995) (denying assessment of costs and explaining that "[n]ot only was it improper for the trial court to award the costs of an appeal prospectively, but such an award would have a chilling effect on a defendant's right to appeal, which this court will not condone"); *cf. Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (stating that, "[w]e are mindful of the argument that allowing the assessment of attorneys' fees may have a chilling effect in deterring the filing of law suits based on innovative theories or to modify, extend, or reverse existing law[ ]" (internal quotation marks, citations, and brackets omitted)); *Kahana Sunset Owners Ass'n v. Maui County Council,* 86 Hawai'i 132, 136 n. 4, 948 P.2d 122, 126 n. 4 (1997) (explaining that attorney's fees would not be awarded because it would have a "chilling effect" and deter citizens from filing suits under HRS § 92–12(c) (1993) [1]); *FASA Corp. v. Playmates Toys, Inc.,* 1 F.Supp.2d 859, 866 (N.D.Ill.1998) (stating that "the chilling effect of awarding Playmates attorneys' fees would be too great and would impose an inequitable burden on FASA under the particular facts and equities presented by this case"); *Fantasy, Inc. v. Fogerty,* 94 F.3d 553, 560 (9th Cir.1996) (noting that "the chilling effect of attorney's fees may be too great or impose an inequitable burden on an impecunious plaintiff"). Therefore, in light of the fact that this court has adopted the new rule that a party's indigency may be considered in assessing costs, the allied factors of the chilling effect an award of costs would have on a person's right to bring suit under circumstances similar to this case and the relative disparity of wealth between the parties should also be considered.

## VI.

The majority asserts that Plaintiffs "never argued that ... imposing costs against them would result in a chilling effect on a person's right to bring suit[,] and ... [never argued that] 'relative disparity of wealth between parties' is a factor to be considered in determining whether to award costs." Majority opinion at 22, 143 P.3d at 1224. On the contrary, as the authorities above indicate,

---

1. Hawai'i Revised Statutes (HRS) 92–12(c) states that with regard to suits concerning public agency meetings and records, the court "may order

payment of reasonable attorney fees and costs to the prevailing party[.]"

this court has before and in this case determined that such factors are germane to a HRS § 607–9 analysis. HRS § 607–9 was raised by the parties and argued by them. Consideration of a constellation of factors, including the two detailed above, is mandated by the directive in HRS § 607–9 that courts consider the equities of the "situation." Hence, this court has established that the chilling effect of an award of fees is an equitable factor. *See Abastillas, supra,* and *Kahana, supra.* If relevant to an award of fees, such a factor should logically be considered when taxing costs against the losing party. In light of the language in HRS § 607–9, the court may consider any equitable factor relevant to the determination of costs. Such an evaluation obviously encompasses factors already sanctioned by this court. The same applies to the majority's reliance on *Paoli,* which lists relative disparity of wealth as a factor that may be considered. Thus, these two factors are well within the scope of any application of HRS § 607–9 by virtue of our established law and the majority's decision to adopt a new rule.

Artificial limitations on the scope of HRS § 607–9, then, would be violative of the plain language of HRS § 607–9. Given the discretionary language of HRS § 607–9, other equitable factors in the adjudication of costs must be considered in the administration of the new rule adopted by this court.

## VII.

Finally, remand is necessary in this case.

This case establishes that a party's inability to pay can be a factor in deciding to award costs. But, the majority *sua sponte* rules that Plaintiffs must produce "evidence about their assets." Majority opinion at 21, 143 P.3d at 1223. Plaintiffs' failure to address "assets" was never raised by any of the parties or the court. With all due respect, to decide on appeal that this failure disqualifies Plaintiffs from consideration of their purported indigency claim denies Plaintiffs due process in terms of fair notice and a fair hearing.

### A.

I note, first, that the majority relies on *Chapman v. AI Transp.,* 229 F.3d 1012, 1039

(11th Cir.2000) (en banc) which ruled in part that "[i]f a ... court[,] in determining the amount of costs to award[,] chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay." Majority opinion at 22, 143 P.3d at 1224 (brackets in original). Insofar as that proposition is relied on it unfairly prejudices Plaintiffs. At the time of this case, our established precedent instructed non-prevailing parties that "some showing" of the inability to pay was necessary to overcome the presumption that a prevailing party be entitled to costs. *See Wong v. Takeuchi,* 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998) (providing that "[t]he presumption that the prevailing party is entitled to costs must be overcome by *some showing that an award would be inequitable under the circumstances* [ ]" (quoting 10 Moore's Fed. Prac. § 54.101(1)(a-b) (3d ed.1998) (emphasis added))). In effect, to suggest that *Chapman* applies, imposes a new requirement of "substantial documentation" that retroactively raises the burden imposed on Plaintiff in the proceeding below.

### B.

Second, the record does not reflect that the parties or the court considered that the *assets* of the plaintiffs should constitute the determinative role in the assessment of costs, as the majority holds. *See Stewart v. Gates,* 987 F.2d 1450, 1454 (9th Cir.1993) (holding that fee awards are reviewed for abuse of discretion and stating that "[a]bsent some indication of how the district court's discretion was exercised, this court has no way of knowing whether that discretion was abused"). The Plaintiffs did attempt to show that they could not satisfy the assessment of costs against them because of limited financial means, particularly by establishing their current income, as well as Benjamin's inability to obtain gainful employment for the past eight years because of his injuries.[2] The majority also recognizes that Plaintiffs adduced evidence indicating their inability to pay, including Benjamin's injuries, the fact that he remains unemployable, the nature of the benefits that Plaintiffs receive, and their

2. Relying on *Wong v. Takeuchi,* 88 Hawai'i 46, 52, 961 P.2d 611, 617 (1998), for the proposition

income stream. Majority opinion at 21, 143 P.3d at 1223.

Yet, the majority singles out the lack of reference to assets as fatal to Plaintiffs' claim that an award of costs would be inequitable. *Id.* at 22, 143 P.3d at 1224. The majority concedes that Plaintiffs "may well be ... unable to pay the assessed costs[,]" *id.* at 22, 143 P.3d at 1224, but nevertheless decides that Plaintiffs "failed to meet their burden of overcoming the strong presumption that [Defendants], as the prevailing parties, [will] recover costs pursuant to HRCP Rule 54(d)[,]" *id.*

There is no indication in the record that Plaintiffs were aware that their failure to list their assets or lack thereof was dispositive in this case, as the majority decides. The majority "decline[s] to adopt a rule that would place on circuit courts the burden of justifying a routine award of costs against losing parties." Majority opinion at 23, 143 P.3d at 1225. But a "routine award" is not involved here inasmuch as a substantial award of costs are involved—$35,463.55—and the equitable factors discussed herein are implicated by the specific facts of the case.[3] The majority resolves the issue in favor of Defendants without Defendants having made such an argument, without any indication the court rendered its decision on that basis, and without allowing Plaintiffs an opportunity to show that in fact they lack the assets the majority would find dispositive.

### C.

The question is not one of abuse of discretion. *See* majority opinion at 23, 143 P.3d at 1225. Inasmuch as this case establishes a new rule and the majority applies that rule by concluding for the first time on appeal that Plaintiffs' assets shall be a significant factor in determining inability to pay costs, the court's prior exercise of discretion is not

that "[t]he presumption that the prevailing party is entitled to costs must be overcome by some showing that an award would be inequitable under the circumstances," Plaintiffs argued in the proceedings below that "[c]ompelling equitable circumstances weigh heavily in favor of disallowing an award of costs against [Plaintiff-Appellant Benjamin] Pulawa" including the fact that he remains unemployable, continues to rely on disability benefits for support, and has limited economic means that prevent him from obtaining doctor-recommended care and treatment.

implicated. Rather, it is fairness that dictates that Plaintiffs be given the opportunity by way of remand to show whether their assets are insufficient to satisfy such costs. *See In re Petition of R.A.*, 66 P.3d 146, 151 (Colo.App.2002) (ruling that "when an appellate court sets forth new standards for resolving an issue, basic fairness may require a remand to the trial court for further proceedings").

### VIII.

Based on the record, any inadequacy in the listing of assets did not appear to enter into the court's ultimate order. In the interest of fairness, this issue should be remanded, permitting the court in the exercise of its equitable power to reconsider its decision in light of the new rule adopted by this court, the requirement regarding assets, and the factors discussed herein relevant to HRS § 607-9.

**3.** The majority's position in this regard appears inconsistent with analogous fee cases. *See, e.g., Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 113, 111 P.3d 1, 8 (2005) (stating that judges must "specify the grounds for awards of attorneys' fees and the amounts awarded with respect to each ground" for "[w]ithout such an explanation, we must vacate and remand awards for redetermination and/or clarification").