**Electronically Filed
Supreme Court
SCWC-11-0001019
04-NOV-2015
09:43 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

BENJAMIN N. PULAWA, III,
Petitioner/Claimant-Appellant,

vs.

OAHU CONSTRUCTION CO., LTD.,
Respondent/Employer-Appellee,

and

SEABRIGHT INSURANCE COMPANY,
Respondent/Insurance Carrier-Appellee.

_____

SCWC-11-0001019

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0001019; CASE NO. AB 2009-496 (2-96-12947))

NOVEMBER 4, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

This case arises out of a work-related injury

Petitioner Benjamin Pulawa, III (Pulawa) incurred while employed

as a construction supervisor for Oahu Construction Co., Ltd. (Oahu Construction) and the subsequent workers' compensation claims made against Oahu Construction, insured by Seabright Insurance Company. The issues presented on appeal are 1) whether there was substantial evidence to show that a neuromonics device was reasonably needed to treat Pulawa's tinnitus and 2) whether Pulawa was no longer entitled to total temporary disability (TTD) payments because he was able to resume work. We hold that there was substantial evidence that the neuromonics device was reasonably needed for treating Pulawa's tinnitus, and that based on this finding, Pulawa was not medically stable and unable to return to work. Thus, the Labor and Industrial Relations Appeals Board (LIRAB) clearly erred in its determination that Pulawa was not entitled to the neuromonics device and in its decision to terminate Pulawa's TTD payments. Accordingly, the Intermediate Court of Appeals' (ICA) December 16, 2014 Judgment on Appeal and LIRAB's November 2, 2011 Decision and Order are vacated. The case is remanded to LIRAB for proceedings consistent with this opinion.

## I. Background

### A. Pulawa's Work-Related Accident

Pulawa's tinnitus diagnosis is due to a work-related accident. On August 20, 1996, Pulawa was employed by Oahu

Construction as a construction supervisor when he was injured. As he was observing the construction operations, Pulawa was struck in the head by a 12 inch by 6 inch rock that became airborne after being run over by a loader vehicle. The force from this projectile cracked Pulawa's hard hat and fractured his skull.[1] As a result of this accident, Pulawa now suffers severe headaches, tinnitus, and depression. Tinnitus sufferers hear ringing or other sounds in the ear when no external sound is present. See 11 Roscoe N. Gray & Louise J. Gordy, Attorneys' Textbook of Medicine ¶ 84.63 (3d ed. 2014). Pulawa suffers from chronic bilateral tinnitus, which is described as a "constant, high-pitched tone." Pulawa has not returned to work since he was injured in August 1996.

B.    **Pulawa's Medical Treatment and Doctor Evaluations**

Immediately after the accident, Pulawa was treated at The Queen's Medical Center and required surgery to repair a left frontal skull depressed fracture. As he recovered from surgery, Pulawa suffered from impaired cognitive functions. After more than two weeks of hospitalization, Pulawa was transferred to the Rehabilitation Hospital of the Pacific for another two weeks, where he received physical, occupational, and speech therapy.

---

[1]    Pulawa sued the landowner and other parties involved for negligence, but he did not prevail. Pulawa v. GTE Hawaiian Tel, 112 Hawaiʻi 3, 7-8, 143 P.3d 1205, 1209-10 (2006).

After his release from the Rehabilitation Hospital, Pulawa continued outpatient therapy on a monthly basis for approximately two years. His primary complaints consisted of headaches, cognitive issues, and sleep problems. While early reports do not specifically list tinnitus as a complaint, he was briefly prescribed tinnitus medication (amitriptyline) in 1997 and also complained of ringing in his ears during an independent neuropsychological evaluation performed in 2000.

Pulawa has been continuously treated for his ailments— primarily headaches and tinnitus—from the time of the accident. Dr. Barry Odegaard, Pulawa's family physician, treated Pulawa from 1997 to approximately 2001. Dr. Robert Marvit, a psychiatrist, treated Pulawa from early 2001 to late 2009, when he retired. In 2001, Dr. Marvit prescribed a treatment plan that consisted of Pulawa attending the Casa Colina Center of Rehabilitation (Casa Colina), a residential brain injury treatment program in Pomona, California, for several months.[2] Dr. Marvit believed that the residential treatment program would allow Pulawa to maximize his capacities so that he would be

---

[2] Dr. Marvit's status as an attending or concurrent physician under Hawai'i Administrative Rules (HAR) § 12-15-32 or § 12-15-40, which is required to submit a treatment plan, was challenged by Oahu Construction. Subsequently, Dr. Marvit was found to be a concurrent physician by the Director of the Department of Labor and Industrial Relations. However, further challenges to Dr. Marvit's treatment plan, including attendance in the Casa Colina treatment program, were brought by Oahu Construction.

"functionally capable of returning to useful, gainful activity." Dr. Marvit noted that the program "would also include less reliance on medication, increased interpersonal, positive interactions, avoidance of self-destructive behaviors, pain control, and an exercise of his vocational potential."

Dr. David Patterson, the Medical Director at Casa Colina, stated in his preadmission screening report that Pulawa was an acceptable candidate for the brain injury treatment program, even though Pulawa had some "psychological overlay" that was preventing further recovery. Despite this psychological hindrance, Dr. Patterson believed that Pulawa had persistent physical and neurocognitive symptoms, such as tinnitus, that needed to be addressed. Proposed treatment included admission to Casa Colina's comprehensive neuropsychological program that would provide Pulawa with "compensatory strategies to deal with the emotional, cognitive and psychological difficulties." In addition, Dr. Patterson recommended cervical trigger point injections to promote movement in the neck, an evaluation of his migraine-type medications, and evaluations by specialists in otology, neurology, audiology, oral/maxillofacial, and neuro-optometry to further his recovery. Pulawa agreed to attend the treatment program.

5

However, admission to Casa Colina was delayed for nearly six years due to Oahu Construction's challenge of Dr. Marvit's treatment plan recommending admission. After the Director of the Department of Labor and Industrial Relations, Disability Compensation Division (Director) approved the treatment plan and LIRAB affirmed the Director's decision, Pulawa attended Casa Colina, where he participated in the program from September 2007 to February 2008.

During the treatment program, Pulawa received several treatments to manage and relieve his headaches, tinnitus, and depression. Relevant to this appeal, Dr. Lucy Shih, a specialist in otology and neurotology at the Casa Colina center, examined Pulawa and recommended that he be fitted with a neuromonics device, a device that at the time was only available at the House Ear Institute in Los Angeles, California. Dr. Shih was referred by Dr. Patterson specifically to assess treatment options for Pulawa's tinnitus symptoms. Dr. Shih stated in a letter to Dr. Patterson that she informed Pulawa of "a relatively new tinnitus treatment which may be beneficial." Dr. Shih described the device as "a listening device manufactured by Neuromonics which incorporates a neural stimulus into music to interrupt and desensitize the brain from continued perception of [tinnitus]." The device consists of earphones connected to a

6

small compact music player.  Dr. Patterson agreed with Dr. Shih's recommendation to fit Pulawa with a neuromonics device.  However, Pulawa was released from Casa Colina after five months of treatment, returning to Hawai'i in February 2008, without being fitted for the neuromonic device.[3]

Rather than authorizing the neuromonics device after Pulawa completed the Casa Colina program, Oahu Construction requested two independent evaluations by Drs. Brian Goodyear, a neuropsychologist, and Anthony Mauro, a neurologist, as well as a vocational rehabilitation assessment, to update Pulawa's workers' compensation disability status.

1.  **Dr. Brian Goodyear's Supplemental Independent Psychological Evaluation**

Dr. Goodyear, a neuropsychologist, evaluated Pulawa on May 23, 2008 and May 27, 2008 after Pulawa sought authorization from Oahu Construction for the neuromonics device that he had not received during his treatment in California.  Although Dr. Goodyear concluded Pulawa was medically stable and therefore would not improve with future treatment, he did not discuss the utility of the neuromonics device in his report; nor did he

---

[3]     From the record, it appears that Pulawa was unable to be fitted with the device in California for several reasons, including: 1) Seabright Insurance required extensive documentation in order to process the request for the neuromonics device consultation; 2) the insurance adjustor assigned to Pulawa's case retired while the request was pending; and 3) the House Ear Institute had a large backlog of patients, and appointments were scheduled several weeks or months in advance.

address the opinions of Dr. Shih and Dr. Patterson recommending the neuromonics device for treatment of Pulawa's tinnitus.

In his report, Dr. Goodyear noted that he evaluated Pulawa on two previous occasions, December 1999 and July 2004. After briefly summarizing Pulawa's extensive medical history, Dr. Goodyear opined there was no significant change in Pulawa's condition since the 2004 evaluation. Although Pulawa had completed the Casa Colina program and met with Dr. Marvit on a regular basis, Dr. Goodyear concluded there was little improvement for a number of reasons—primarily because Pulawa lacked motivation and was magnifying his symptoms. Dr. Goodyear reasoned that Pulawa "had become very entrenched in the disabled role" and that he had powerful financial incentives to not give up that role. Specifically, Dr. Goodyear mentioned that Pulawa was receiving about $5,000 per month in benefits. Based on the foregoing, Dr. Goodyear concluded that from a neuropsychological perspective, Pulawa's condition remained stable and ratable, and he remained at a 25% permanent impairment rating.

In regard to returning to work, Dr. Goodyear concluded that while Pulawa would have some difficulty returning to his usual and customary work, he was capable of returning to productive employment. He did not believe any significant changes in Pulawa's subjective complaints and functional status

8

would occur in the future.  Thus, according to Dr. Goodyear, Pulawa required no further psychological or neuropsychological testing and no significant changes in Pulawa's subjective complaints and functional status would occur in the future.  However, Dr. Goodyear's report did acknowledge the need to engage in further review of his current medical regimen for headaches.  Throbbing headaches, tinnitus, interrupted sleep, memory problems, difficulty with loud noises, and depression were reported to Dr. Goodyear during each of his evaluations of Pulawa.  Based on this history, Dr. Goodyear recommended that a neurologist evaluate Pulawa to review the effectiveness of his current treatment regimen for his headaches and determine whether Pulawa had achieved maximum medical improvement.

### 2.  Dr. Anthony Mauro's Independent Medical Evaluation

On July 3, 2008, Dr. Mauro, a neurologist, completed Pulawa's second independent medical examination due to Pulawa's request for the neuromonics device.  His examination was limited to a records review; he did not personally communicate with Pulawa.  Regarding the neuromonics device, Dr. Mauro admitted that he was not aware of the device being "available for treatment of tinnitus" or whether the device met "an accepted standard of treatment for tinnitus."  Nonetheless, based on his review of the medical records, Dr. Mauro concluded Pulawa's

9

medical condition was medically stable and ratable, and that his symptoms would never completely subside. Dr. Mauro was concerned that Pulawa had an "inappropriate hope for '100%' recovery." In particular, Dr. Mauro pointed out that in late 1997, the Chief of Psychology Services at the Rehabilitation Hospital of the Pacific, Kathleen S. Brown, Ph.D., stated that Pulawa "[did] not appear to fully appreciate the need for self management and treatment of chronic pain and continues to seek [a] medical cure for his pain." Dr. Mauro was concerned that Pulawa's history of seeking a medical cure meant that he required his condition to return to "100%" prior to returning to any type of employment.

Dr. Mauro concluded that although Pulawa suffers from significant cognitive and personality deficits from his head injury, he is capable of gainful employment, albeit not as a construction supervisor. Indeed, based on his review of Pulawa's records, Dr. Mauro reasoned that Pulawa would never report improvement in his symptoms, regardless of future treatment.

Dr. Mauro's opinion did not include a position as to whether the neuromonics device was reasonably needed for Pulawa's greatest possible medical rehabilitation. Nor did he address the opinions of Dr. Shih and Dr. Patterson recommending

10

the neuromonics device for treatment of Pulawa's tinnitus.  He reviewed two academic studies of the device—one of which found the treatment "promising," although it lacked "ideal placebo control."  According to Dr. Mauro's report, the second study stated that "electrical suppression of the tinnitus does not offer a promising outcome for patients."  After reading the two articles, he concluded there was no "basis for enthusiasm for ongoing efforts to treat the tinnitus."

### 3.   Vocational Counselor Priscilla Ballesteros Havre's Independent Vocational Rehabilitation Report

Ms. Priscilla Ballesteros Havre performed an independent vocational rehabilitation review dated November 6, 2008, at the request of Oahu Construction to determine whether Pulawa was capable of returning to work.  She did not address the opinions of Dr. Shih and Dr. Patterson, recommending the neuromonics device for treatment of Pulawa's tinnitus.  After reviewing the reports of Dr. Goodyear and Dr. Mauro and a prior vocational rehabilitation report from 1997, Ms. Ballesteros Havre endorsed the views of Dr. Mauro and Goodyear to conclude that Pulawa's symptoms, his current daily activities, his tendency to magnify symptoms, his average cognitive abilities, and the amount of compensation he received on disability rendered him capable of returning to gainful employment if he were motivated to do so.

Based on her opinion that Pulawa lacked motivation, Ms. Ballesteros Havre conducted no independent analysis as to whether Pulawa was capable of returning to work.

4.    **Pulawa's Treating Physician Rejects Opinions of Independent Medical Examiners**

Dr. Marvit submitted a treatment plan on December 2, 2008 rejecting the opinions of the three independent medical examiners retained by the employer.  As Pulawa's treating physician, Dr. Marvit was not of the view that Pulawa was medically stable and would not benefit from further treatment.  Consistent with Dr. Shih and Patterson, he requested Pulawa receive concurrent care at the House Ear Institute in order to be fitted with the neuromonics device.  In a letter dated February 26, 2009, Dr. Marvit stated that "without approval of the treatment plan outlined by myself and Casa Colina, he will remain in a permanently impaired disabled state, and the likelihood of any kind of recovery will be minimal to absent."  He also noted that "[i]n addition, one would expect further deterioration of his function, which would end up ultimately in either his premature death, or institutionalization."

5.    **Oahu Construction Denies the Neuromonics Device and Seeks To Terminate TTD Payments**

Based on the evaluations of Drs. Goodyear and Mauro, and the review by vocational counselor Ms. Ballesteros Havre,

Oahu Construction took two actions.  First, on December 5, 2008, it denied Dr. Marvit's December 2, 2008 treatment plan requesting that Pulawa be fitted for the neuromonics device at the House Ear Institute in California.  Second, on December 16, 2008, Oahu Construction gave notice to Pulawa, in accordance with Hawai'i Revised Statutes (HRS) § 386-31 and Hawai'i Administrative Rules (HAR) § 12-10-26, seeking to terminate TTD payments no later than December 30, 2008 because the reports of Drs. Goodyear and Mauro and vocational counselor Ms. Ballesteros Havre showed that Pulawa had "retired from the labor market and is not entitled to income and indemnity benefits."  After Oahu Construction denied Pulawa's request to be fitted with a neuromonics device and gave notice of its intent to terminate TTD payments, Pulawa sought relief from the Director.

C.  **Department of Labor and Industrial Relations Proceedings**

Pulawa requested a hearing to determine whether Dr. Marvit's treatment plan dated December 2, 2008 was improperly denied and to determine if TTD payments were properly terminated.[4]  On March 30, 2009, the Director determined that

---

[4]     On January 5, 2009, Pulawa's first request for the neuromonics device was denied on the basis that the attending physician did not submit to Oahu Construction a written request for the neuromonics device that comported with the requirements of HAR § 12-15-51(a), which outlines the notice requirements applicable when an attending physician requests approval from the employer to treat the employee.

Pulawa was not entitled to a neuromonics device.[5]  The Director also concluded on March 30, 2009 that Pulawa was entitled to TTD benefits only through December 16, 2008[6] based on Dr. Goodyear's and Mauro's opinion that Pulawa was capable of returning to work.  The Director also awarded Oahu Construction a credit for TTD payments from December 17, 2008 through December 30, 2008.  Finally, the Director found that the issue of permanent disability was premature because there was no impairment rating for Pulawa's injuries and that the issue would be decided at a later date.  Pulawa appealed the March 2009 decision to LIRAB, which triggered Oahu Construction's request for an additional independent medical evaluation performed by Dr. Ajit Arora, an internist.

### 1.    Dr. Ajit Arora's Independent Medical Evaluation

Dr. Arora performed Pulawa's third independent medical evaluation on behalf of Oahu Construction on July 6, 2010.  Dr. Arora addressed Pulawa's medical stability, ability to return to work, and need for further treatment.  He did not conclude that

---

[5]    The Director's decision was based on Pulawa's failure to appeal the January 5, 2009 decision within the 20 days required by HRS § 386-87(a).  LIRAB and the ICA, however, reached the merits of Pulawa's claim, as discussed infra.  The procedural issue cited by the Director was not raised by the parties on certiorari and is thus not addressed herein.

[6]    Oahu Construction gave notice of its intent to terminate TTD payments on December 16, 2008.

14

the neuromonics device was not reasonably needed for Pulawa's greatest possible rehabilitation.

After examining Pulawa and reviewing the medical records, Dr. Arora came to several conclusions. First, Dr. Arora determined that Pulawa's condition was medically stable and eligible for a permanent disability rating because his symptoms had remained unchanged for several years. Second, Dr. Arora concluded that while Pulawa suffers from throbbing headaches and tinnitus, he is able to be employed in a position that will accommodate his limitations. Dr. Arora pointed out that he had several patients who were able to work with severe tinnitus symptoms. Like Drs. Goodyear and Mauro, Dr. Arora agreed that motivation was an important factor in Pulawa's return to work because Pulawa "is probably making more money now than he would if he returned to some type of modified employment."

Third, Dr. Arora determined that although Pulawa received appropriate treatment for the throbbing headaches, cognitive dysfunction, and depression, the treatment at Casa Colina was of questionable relevance and significance. Dr. Arora opined that the necessity and utility of such a program was highly questionable because Pulawa's injury was over 10

15

years old at the time, and thus resulted in a waste of resources and time.

Next, Dr. Arora acknowledged in his report that the work injury and noise exposure caused Pulawa's tinnitus, but he did not recommend the neuromonics device. He stated that he had "serious[] doubt" that the use of "a neuromonics device for this symptom" "would be of any benefit"——noting that "[t]here is no proven treatment for tinnitus." In apparent contradiction, however, Dr. Arora endorsed a treatment for tinnitus; he agreed that the medication prescribed by his treating physician, amitriptyline, "is typically the . . . medication prescribed for such patients and may help some cases." Further, Dr. Arora acknowledged that Pulawa's tinnitus condition was capable of improvement. He stated that better control of Pulawa's throbbing headaches, which "aggravate and exacerbate his tinnitus to a great extent," would lead to reduced tinnitus symptoms. Dr. Arora left unanswered why amitriptyline medication qualified for treatment of the tinnitus, but the neuromonics device did not. Dr. Arora ventured agreement with Dr. Mauro that the neuromonics device "would be of questionable value and benefit to Mr. Pulawa for treatment of his tinnitus." He did not directly address the opinions of Dr. Shih and Dr.

16

Patterson recommending the neuromonics device for treatment of Pulawa's tinnitus.

Having found that Pulawa suffered from tinnitus; that it was capable of improvement with medication; and that continuing treatment for tinnitus, depression, and headaches was necessary, Dr. Arora recommended Pulawa seek a one-time consultation with a "Dr. Raskin" at the University of California at San Francisco, who was a specialist in headaches. Though this analysis does not connote medical stability, Dr. Arora nonetheless determined that Pulawa's condition was medically stable.

2. **LIRAB Affirms the Director's March 30, 2009 Decision**

LIRAB heard testimony at the hearing from Pulawa and Dr. Scott McCaffrey that was contrary to Dr. Arora's report. They testified in support of Pulawa's request for the neuromonics device and for the continuation of TTD benefits. Pulawa testified that he was not able to work with his headaches and tinnitus. He stated that the primary ailments that remain from the accident include heavy throbbing and "head pains" along with ringing in the ears. Pulawa confirmed that he had seen several specialists since the accident for his headaches, tinnitus, and depression. Regarding his tinnitus, Pulawa

17

confirmed that he was prescribed oral medication and a noise-masking device, but these treatments were unsuccessful.

Dr. Scott McCaffrey, Pulawa's attending physician at the time of the hearing, testified that he did not believe Pulawa was medically stable. Dr. McCaffrey explained that his office was addressing injuries to Pulawa's neck and lower back that were not treated by previous doctors, Pulawa's tinnitus was still untreated, and he was receiving treatment for emotional problems. Dr. McCaffrey noted that tinnitus is a very difficult problem and that "no one has found a cure," although he stated that there are medications that show promise in clinical studies. No witnesses testified in support of the Director's decision denying the neuromonics device and terminating Pulawa's TTD payments.

LIRAB affirmed the Director's decision denying Pulawa the neuromonics device and terminating his TTD payments in its November 2, 2011 Decision and Order. It made no finding as to whether the neuromonics device was reasonably needed for Pulawa's greatest possible rehabilitation, although it did opine that the neuromonics device was not "reasonable or necessary" medical care.[7]

---

[7]     As discussed infra, in its Decision and Order, LIRAB incorrectly applied "reasonable and necessary" as the standard to determine Pulawa's request for the neuromonics device:

(continued . . .)

18

In affirming the Director's termination of TTD payments, LIRAB credited Dr. Mauro's opinion that Pulawa's medical condition was stable and that although he would have some difficulty returning to his job as a construction supervisor, he was capable of returning to gainful employment.

LIRAB found that Pulawa's testimony supported his ability to return to work. It emphasized Pulawa's testimony regarding his ability to operate a vehicle, his visits to Ala Moana Beach Park three days a week, and his ability to care for himself without assistance at home.[8] LIRAB found unconvincing Pulawa's testimony that he could not return "to work in his present condition."

Accordingly, LIRAB concluded that the neuromonics device was not "reasonable or necessary" medical care, that

_____

(. . . continued)

> The Board finds that the requested Neuromonics device is not reasonable and necessary medical care, services, or supplies relative to Claimant's work injury.
>
> . . . .
>
> The Board concludes that the Director did not err in denying Claimant's request for a Neuromonics device. Such device is not reasonable or necessary medical treatment for Claimant's work injuries.

(Emphases added).

[8] Pulawa stated that his drives to Ala Moana are about nine miles in length and that he experiences headaches while driving forcing him to pull over. Pulawa also testified that he is unable to handle family finances because of his injury.

19

Pulawa was not certified as temporarily and totally disabled, that Pulawa was medically stable, and that Oahu Construction was entitled to a credit for TTD payments paid between December 17, 2008 and December 30, 2008 to be applied to the future award of permanent disability benefits. Pulawa appealed to the ICA.

**D.  ICA Appeal**

In its Summary Disposition Order, the ICA affirmed LIRAB's Decision and Order. Pulawa v. Oahu Constr. Co., Ltd., No. CAAP-11-0001019, 2014 WL 5503365 (App. Oct. 30, 2014) (SDO). The ICA rejected Pulawa's position that he was entitled to the neuromonics device for treatment of his tinnitus condition under HRS §§ 386-21(a) and 386-24. Id. at *3. Giving deference to LIRAB's determination of credibility between the contrasting doctor's opinions as to the need for the neuromonics device, the ICA affirmed denial of the device. Id.

The ICA also held that LIRAB properly terminated Pulawa's TTD payments. Id. at *4-5. The ICA reasoned that under HRS §§ 386-1 and 386-31(b), TTD payments are terminated "upon order of the director or if the employee is able to resume work." Id. at *3 (citation omitted) (internal quotation mark omitted). Accordingly, the "able to resume work" definition required that Pulawa's injury was stable and that Pulawa was capable of working "in an occupation for which [he] has received

20

previous training or for which [he] has demonstrated aptitude."
Id. at *4-5 (alteration in original) (internal quotation marks
omitted).  The ICA held that LIRAB's determination regarding
Pulawa's medical stability and his ability to return to work was
not clearly erroneous.  Id. at *5.  In this regard, the ICA
pointed to the physician reports opining that Pulawa's condition
was stable and that he could return to work with his injury's
limitations.  Id.  The ICA concluded that these reports amounted
to substantial evidence supporting Pulawa's injury stability and
his ability to return to work.  Id.

## II.  Standards of Review

### A.  Findings of Fact and Conclusions of Law

The standard of review for LIRAB decisions is well-
established:

> Appellate review of a LIRAB decision is governed by
> HRS § 91-14(g) (1993), which states that:
>
> Upon review of the record the court may affirm the
> decision of the agency or remand the case with
> instructions for further proceedings; or it may
> reverse or modify the decision and order if the
> substantial rights of the petitioners may have been
> prejudiced because the administrative findings,
> conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory
> provisions; or
> (2) In excess of the statutory authority or
> jurisdiction of the agency; or
> (3) Made upon unlawful procedure; or
> (4) Affected by other error of law; or
> (5) Clearly erroneous in view of the reliable,
> probative, and substantial evidence on the whole
> record; or

21

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

We have previously stated:

[Findings of Fact] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.

[Conclusions of Law] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.

A [Conclusion of Law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.

Igawa v. Koa House Rest., 97 Hawaiʻi 402, 405-06, 38 P.3d 570, 573-74 (2001) (quoting In re Water Use Permit Applications, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000)) (internal quotation marks omitted).

[A Finding of Fact] or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In re Water Use Permit Applications, 94 Hawaiʻi at 119, 9 P.3d at 431 (citations omitted) (internal quotation marks omitted).

22

**B.    LIRAB's Statutory Interpretation**

An appellate court

> generally reviews questions of statutory interpretation <u>de novo</u>, but, [i]n the case of . . . ambiguous statutory language, the applicable standard of review regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous[.]

<u>Gillan v. Gov't Emps. Ins. Co.</u>, 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008) (alteration in original) (citations omitted) (internal quotation marks omitted).

### III.    Discussion

**A.    The Neuromonics Device Was an Aid "Reasonably Needed for the Employee's Greatest Possible Medical Rehabilitation"**

LIRAB and the ICA applied an incorrect "reasonable and necessary" standard to determine whether to approve the neuromonics device under HRS §§ 386-21(a) and 386-24.[9]  An employee is entitled to <u>reasonably needed</u> medical care after a work-related injury.  HRS § 386-21(a),[10] titled "[m]edical care,

---

[9]     From the language of LIRAB's decision, "reasonable and necessary" and "reasonable or necessary" appear to be used interchangeably.  This court will apply the "reasonably needed" standard set forth in HRS §§ 386-21(a) and 386-24 to determine whether Pulawa is entitled to the neuromonics device.

[10]     HRS § 386-21(a) (1993) states as follows:

> Immediately after a work injury sustained by an employee and so long as reasonably needed the employer shall furnish to the employee all medical care, services, and supplies as the nature of the injury requires.  The liability for the medical care, services, and supplies shall be subject to the deductible under section 386-100.

services, and supplies," requires that "[i]mmediately after a work injury sustained by an employee and <u>so long as reasonably needed</u> the employer shall furnish to the employee all medical care, services, and supplies as the nature of the injury requires."[11]  (Emphasis added).  In addition to medical treatment for injury, an employee is entitled to medical services and supplies reasonably needed for the employee's greatest possible medical rehabilitation.  HRS § 386-24,[12] titled "[m]edical rehabilitation," states that "[t]he medical services and supplies to which an employee suffering a work injury is entitled shall include such services, aids, appliances, apparatus, and supplies as are <u>reasonably needed</u> for the employee's <u>greatest possible</u> medical rehabilitation."  (Emphases added).

---

[11]     In 1963, the Hawai'i workers' compensation statute was amended for the purpose of, <u>inter alia</u>, "mak[ing] changes necessary to eliminate unnecessary hardships and inequities, . . . and mak[ing] certain major and minor substantive improvements in the provisions governing workmen's compensation."  S. Stand. Comm. Rep. No. 334, in 1963 Senate Journal, at 788.

[12]     HRS § 386-24 (1993) states as follows:

> The medical services and supplies to which an employee suffering a work injury is entitled shall include such services, aids, appliances, apparatus, and supplies as are reasonably needed for the employee's greatest possible medical rehabilitation. The director of labor and industrial relations, on competent medical advice, shall determine the need for or sufficiency of medical rehabilitation services furnished or to be furnished to the employee and may order any needed change of physician, hospital or rehabilitation facility.

LIRAB and the Director rejected the neuromonics device based on a standard more strict than allowed by statute: "reasonable and necessary." As noted, HRS §§ 386-21(a) and 386-24 require application of a "reasonably needed" standard. The term "reasonably needed" is not defined by statute, but it is less restrictive than the "reasonable and necessary" standard used by LIRAB.[13]

Additionally, the "greatest possible medical rehabilitation" language in HRS § 386-24 lends a definition to "reasonably needed" that is significantly more broad than "reasonable and necessary." See HRS § 1-16 (2009) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another."); State v. Casugay-Badiang, 130 Hawai'i 21, 27, 305 P.3d 437, 443 (2013) (same). The words "greatest" and "possible" define the high degree of medical assistance due an injured employee. The statute does not say merely "possible" medical rehabilitation; nor does it state simply "employee's medical rehabilitation." Thus, aid that can provide the

---

[13] The Merriam-Webster Online Dictionary definition of "necessary" is "absolutely needed" or "required"—a stricter definition than merely "needed." Merriam–Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/necessary (last visited Oct. 30, 2015).

"greatest possible" medical rehabilitation for a claimant is "reasonably needed" absent substantial evidence to the contrary.

Viewed under the reasonably needed standard as properly applied, LIRAB clearly erred because "the record lacks substantial evidence to support the finding" that the neuromonics device was not reasonably needed for Pulawa's greatest possible medical rehabilitation. See In re Water Use Permit Applications, 94 Hawai'i at 119, 9 P.3d at 431. Our court has defined substantial evidence as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citations omitted) (internal quotation mark omitted). The reports of Dr. Goodyear, Mauro, and Arora, credited by LIRAB, do not constitute substantial evidence supporting a finding that the neuromonics device was not reasonably needed to treat Pulawa's tinnitus for his greatest possible medical rehabilitation. None of the three opined that the device is not reasonably needed. Dr. Goodyear never explicitly mentioned the neuromonics device to reach his conclusion that any further treatment would not lead to Pulawa reporting an improvement in symptoms. Dr. Mauro conceded he was not aware of whether the device is an accepted standard of treatment or whether it is available for Pulawa in Hawai'i; and his observation that he experienced little enthusiasm about the

26

device's utility in treating Pulawa's tinnitus cannot qualify as substantial evidence the device is not reasonably needed for Pulawa's greatest possible medical rehabilitation.  Finally, while Dr. Arora expressed "serious doubt" that the use of the neuromonics device "would be of any benefit," without further analysis, he merely agreed with Dr. Mauro that the device has "questionable value and benefit."  Significantly, the three doctors had no experience with the device.

In contrast, Dr. Shih's opinion was based upon experience with the neuromonics device and medical expertise specifically related to studying and treating diseases and disorders of the ear: otology and neurotology.  Pulawa was referred by Dr. Patterson, the Director of the Casa Colina brain injury treatment program, to Dr. Shih because she specialized in otology and neurotology.  In her opinion, the neuromonics device could be beneficial to treat Pulawa's tinnitus, although it was a relatively new treatment.[14]

Thus, the ICA's deference to LIRAB was based on a false factual assumption that "there were varying opinions among the physicians as to whether a Neuromonics device was 'reasonably needed.'"  Pulawa, SDO, 2014 WL 5503365, at *2.  In actuality, as discussed supra, no physician mentioned whether

---

[14]    Her recommendation was of such significance to Dr. Patterson that he arranged to have Pulawa fitted for the device.

27

the device was "reasonably needed;" nor did LIRAB address whether the device was "reasonably needed."

The nature of Pulawa's injury and his treatment history also establish a need to augment, albeit with a new method, 14 years of unsuccessful strategies to treat his tinnitus.  After his traumatic brain injury, he underwent rehabilitative therapy, medications with varying side effects, injections in his neck, and a five month treatment regimen in California without relief from his tinnitus.  He was also treated for tinnitus with a noise-masking device to no avail.  Conventional, approved treatment regimens have thus failed.  A new device designed to treat his ailment is now available as a treatment option.

Thus, properly applied—and based on the evidence before LIRAB—the "reasonably needed" standard enumerated in HRS §§ 386-21(a) and 386-24 compels a finding that Pulawa's claim for the neuromonics device be granted in order for him to attain the "greatest possible medical rehabilitation."

**B.   The Record Lacks Substantial Evidence that Pulawa Is Stable and Able To Resume Work**

The Director and LIRAB determined that Pulawa was no longer entitled to TTD payments because he is "capable of resuming some form of full-time work."  The statutory definition of "able to resume work" requires that Pulawa's injury

28

"stabilized after a period of recovery" and that he "is capable of performing work in an occupation for which [he] has received previous training or for which [he] has demonstrated aptitude" prior to the termination of TTD payments. HRS § 386-1 (Supp. 2005).[15] As discussed supra, LIRAB's finding—affirmed by the ICA—that Pulawa was not entitled to the neuromonics device was clearly erroneous. Based on the present posture of the record, until Pulawa receives the opportunity for the greatest possible medical rehabilitation with the neuromonics device, his benefits should not be terminated.[16] Accordingly, Pulawa is entitled to reinstatement of TTD payments until he has had a reasonable

---

[15] HRS § 386-31(b) (Supp. 2005) states that employers can terminate TTD payments "upon order of the director or if the employee is able to resume work."

[16] Dr. Scott McCaffrey, Pulawa's treating physician at the time of the hearing before LIRAB, testified that Pulawa was not medically stable due to, inter alia, his tinnitus:

> Well I do not believe he is [medically stable] for the following reasons, we're still working up his complaints and pains that he has in his neck and his low back and have found some structural damage to those two areas; areas which by the way I don't think were addressed much in the many years prior to his coming to see us, because his primary injury was a very severe head injury as you know . . . above and beyond that he has ongoing significant complaints of ringing in his ears, or tinnitus, headaches, post injury headaches which may be implicated by the neck as well which is one reason we're pursuing the neck cause [sic] it can drive headaches in addition to primary injuries to the skull. Also he's been struggling with emotional problems related to the injury; I believe he's got a traumatic brain injury picture where he's not—he doesn't think as well as he did and that plus the pain plus all the impairment has resulted in a depression[.]

(Emphasis added).

29

opportunity to receive treatment for his tinnitus with the neuromonics device and for any possible permanent partial disability rating to be assessed.

## IV. Conclusion

For the foregoing reasons, the ICA's December 16, 2014 Judgment on Appeal and the November 2, 2011 Decision and Order of the Labor and Industrial Relations Appeals Board are vacated. The case is remanded to LIRAB for proceedings consistent with this opinion.

Dan. S. Ikehara
for petitioner

Brian G.S. Choy and
Keith M. Yonamine
for respondents

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

